IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**DEVON BAY, JOHN BURKS, DANIEL ESPINOSA, CRAIG FITZGERALD, JOEL MASON, and DAVID RICE,**

    **Plaintiffs,**

**v.**

Civ. No. _____

**TIM KELLER, SARITA NAIR, HAROLD MEDINA, ARTURO SANCHEZ, ALBERT SANDOVAL, and the CITY OF ALBUQUERQUE,**

    **Defendants.**

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, TORTS, AND DAMAGES

Plaintiffs Devon Bay, John Burks, Daniel Espinosa, Craig Fitzgerald, Joel Mason, and David Rice, by and through their counsel of record, Kennedy, Hernandez & Associates, P.C., bring this complaint for violations of their civil rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, and for torts under the New Mexico Tort Claims Act and state common law. The Plaintiffs allege as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. § 1343, with pendent jurisdiction over the state law claims. Venue is proper in this district, as the Plaintiffs and the Defendants are all New Mexico residents and acts complained of occurred in New Mexico. The Plaintiffs' causes of action arose in New Mexico.

### PARTIES

2. Plaintiffs Devon Bay, John Burks, Daniel Espinosa, Craig Fitzgerald, Joel Mason,

and David Rice are each individual residents of New Mexico and were so at all times relevant hereto.

3. During all times relevant hereto, Defendant Tim Keller was the Mayor of the City of Albuquerque and an individual resident of Bernalillo County, New Mexico, acting under the color of state law. Defendant Keller is sued in both his individual and official capacities.

4. During all times relevant hereto, Defendant Sarita Nair was Chief Administrative Officer ("CAO") of the City of Albuquerque and an individual resident of Bernalillo County, New Mexico, acting under the color of state law. Defendant Nair is sued in both her individual and official capacities.

5. Defendant Harold Medina is currently Chief of the Albuquerque Police Department ("APD") in Bernalillo County, New Mexico; he held the position of Deputy Chief at the time of the events described below and was acting under the color of state law. He is, upon information and belief, a resident of Bernalillo County, New Mexico. Defendant Medina is sued in both his individual and official capacities.

6. Defendant Arturo Sanchez was, upon information and belief, a Commander in the APD and an individual resident of Bernalillo County, New Mexico, acting under the color of state law during all times relevant hereto.

7. Defendant Albert Sandoval was, upon information and belief, a Sergeant in the APD and an individual resident of Bernalillo County, New Mexico, acting under the color of state law during all times relevant hereto.

8. Defendant City of Albuquerque is a municipality located in Bernalillo County, New Mexico, which employed and exercised direct supervisory control over the Defendants and APD during the relevant period, and created and engaged in the policies and customs described below.

**FACTUAL BASIS**

9. On June 15, 2020, a planned protest was scheduled to occur near the Juan de Oñate statue in Albuquerque, New Mexico, related to whether the statue should be torn down. People both opposed to and in favor of the statue's destruction planned to be in attendance; those expected to attend included a group of individuals called the New Mexico Civil Guard ("NMCG"), whose members participated in some public events and protests for political and civic reasons.

10. Prior to the protest, Defendants Medina, Sanchez, and Sandoval conferred about the protest and NMCG's anticipated attendance. Apparently believing that the NMCG members "may be present to protect the destruction of the statue," they agreed upon a plan for the police response: positioning officers in close proximity to the protest and waiting until a member of the NMCG "commit[ted] a crime," then "mov[ing] in" to "10-16" them. (According to APD radio code, "10-16" refers to taking a "prisoner" into custody.)

11. Upon information and belief, Defendants Keller and Nair knew of and participated in the targeting of NMCG members prior to the scheduled protest, in keeping with their pattern of micromanaging APD and their practice of acting through Defendant Medina, with whom they maintained close ties (and whom Defendant Keller appointed as Chief of Police shortly after the events described herein).

12. Defendant Sandoval summoned the Tactical Section of the Special Operations Division for briefing on this plan at about 4pm on June 15, 2020.

13. Defendant Sandoval and the other Albuquerque police officers responsible for the briefing informed the tactical officers that there was a protest at the statue. Pursuant to the plan created by Defendants Medina, Sanchez, and Sandoval, they identified the "subjects" of the action as "anti-protestors" who opposed dismantling the statue, and more specifically those "anti-

3

protestors" who appeared to be carrying firearms. In short, NMCG members were the intended targets.

14. At the time of the briefing, the Defendants did not present or know of any reports whatsoever of threatening or criminal conduct by anyone associated with the NMCG. They *had* received reports against protesting individuals attempting to destroy the statue and vandalizing the area, but none of these were identified as "subjects."

15. Defendant City of Albuquerque's command team, including the Defendants, instructed the police officers to allow the protestors free rein to damage, destroy, or tear down the statue.

16. Teams of APD officers in armored bearcats were instructed to sit about three blocks away from the demonstration and to take no action until one of the individuals with a firearm discharged it, or the situation otherwise became too violent. Other officers were hiding in the Albuquerque Museum, mere yards away from the statue, with the same instructions. On orders from the command post, these officers held their positions for hours.

17. By approximately 6pm, undercover Albuquerque police officers were monitoring the crowd at the protest and providing updates to the command post.

18. In keeping with prior reports, the undercover officers saw individuals with firearms or wearing camouflage clothing—believed to be the NMCG—but reported to the command post that those men were not "instigating contact or antagonizing the crowd." Defendants Medina, Sanchez, Sandoval, and the other City of Albuquerque personnel in the command post did not alter their plan based on the officers' reports and continued to focus on those individuals as "subjects."

19. As the protest continued, the previous large group began to disperse, leaving a smaller crowd. Protestors in this smaller group gathered around the statue with a pickaxe, chains, and weapons.

20. One of the NMCG members was attacked by protestors and forced to the ground. An undercover officer relayed this information to the command post, but none of the Defendants took any action to protect the victim, and none of the many waiting officers nearby was permitted to approach the scene to help him or to defuse the violence.

21. The NMCG member was able to get back up without harming anyone or using any weapon, after which the Plaintiffs together left the crowd and moved west, away from the statue.

22. While the Plaintiffs were away from the crowd, officers saw "a Hispanic male about 25-30 years of age and wearing a blue sport style tee shirt a[nd] dark colored shorts" in an altercation with multiple protestors. One of the officers described this person and the situation via his handheld radio, including that the man "in dark colored shorts and a light blue shirt (later identified as Stephen Baca)" was retreating from the crowd as it chanted "Get him out of here!"

23. While several officers watched and listened nearby, the male in the blue shirt was tackled to the ground. He pulled out a black handgun and fired it multiple times. The officers immediately reported these events to the command post and all the Defendants were quickly aware of them.

24. After the shooting, the Plaintiffs returned to the scene and ran toward the shooter, stepping on his gun. The shooter remained on the ground. Officers watched and reported this to the command post.

25. Defendants Medina, Sanchez, and the other Defendants knew from the undercover officers on the scene that there was a single shooter involved: the male in the blue shirt. They also

knew that the NMCG members had not been near that shooter or the crowd at the time the shots were fired, and that the NMCG's entire involvement had been to encircle the shooter afterward and step on his gun so he could no longer use it.

26. Despite knowing all this, when the Defendants at the command post communicated with the tactical officers, they conveyed *none* of the detailed descriptions of the shooter. Instead, they ordered the officers to "immediately detain" anyone with a rifle (the type of weapon the Plaintiffs were believed to be carrying, which they knew the actual shooter did not have).

27. The clear intention was that the Plaintiffs would be taken prisoner, irrespective of their actual involvement in any shooting—just as the Defendants had planned several hours before.

28. The tactical officers responded from their nearby hiding places shortly after 8pm. They were immediately approached by many bystanders pointing out that the shooter was the man in the blue shirt, who was on the ground. The officers quickly handcuffed him, although they had received no description of him from the Defendants at the command post.

29. The NMCG members' outfits had green tape marked "NMCG," making them easy to identify. Pursuant to the Defendants' orders, the officers approached them—including at least one NMCG member who had no firearm at all—and ordered them to get on the ground. At about 8:07pm, the Plaintiffs were handcuffed.

30. The Plaintiffs remained on their stomachs on the pavement with their arms cuffed behind their backs as their firearms and other personal property were seized.

31. The Plaintiffs were then placed near the armored bearcats awaiting transport "for investigation." Their seized property was promptly sent to a Crime Scene Specialist at the Old Town Substation for photographing and testing.

32. The Defendants in the command post instructed the tactical officers to take the Plaintiffs to the Main Police Station for questioning.

33. The Plaintiffs were held next to the bearcats for 20 to 25 minutes awaiting transport, handcuffed and unable to leave as people threw rocks and water bottles toward them.

34. During this time, an undercover officer returned to the scene to identify the shooter. He positively identified a man in a blue shirt, Steven Baca, as the one who had fired the handgun.

35. The Plaintiffs were still not released, nor informed that they were not suspects, nor given any opportunity to leave. They were forced to remain near the bearcats as the situation between the police and the protestors escalated, subjecting them to shows of force by both sides.

36. Defendant Sanchez finally ordered several motor officers to stop directing traffic and to "secure" the Plaintiffs, still handcuffed, inside their police vehicles. The Plaintiffs were separated into different vehicles, apparently to prevent their ability to communicate with anyone. At least one had his cellphone seized as well.

37. Because of the problems Defendant Sanchez's orders caused for traffic control, the Plaintiffs were later moved from the motor officers' vehicles back to the tactical officers' units. One of the Plaintiffs was pulled out of a car and forced to sit on the curb to wait for another. All remained handcuffed and unable to leave.

38. At approximately 8:48pm, after the Plaintiffs had already suffered over 40 minutes of handcuffed detention, Defendant Sanchez ordered over the radio that the men were to be kept separated and detained until each had been interviewed on the second floor of the police station.

39. By approximately 8:55pm, while the Plaintiffs were still being transported to the station for their compelled interviews, all the Defendants knew that they were witnesses—not the shooter and not suspects.

40. The Plaintiffs waited in the back of police vehicles outside the station. The shooter, Mr. Baca, was placed in a holding cell.

41. All the Defendants knew that the Plaintiffs remained forcibly detained in police custody as Defendant City of Albuquerque held multiple briefings at the command post at the Main Police Station. When Defendants Keller and Nair arrived for those briefings, they had to pass the vehicles in which the Plaintiffs were being held outside.

42. At "the initial brief," which upon information and belief began sometime after 10pm, the attendees—including all the Defendants—were informed of the video evidence of the shooting that had been posted on Twitter. It revealed one shooter: a male in a blue shirt.

43. At the conclusion of the briefing, an officer went to the holding cells and again confirmed the identity of Steven Baca—not any of the Plaintiffs—as the shooter and sole suspect. The Plaintiffs were still not released.

44. Some or all the Defendants instructed Albuquerque detectives to conduct "witness interviews" of the Plaintiffs. All the Defendants were aware of this plan to continue detaining the Plaintiffs for mandatory, handcuffed "witness interviews" without legal counsel and allowed it to proceed.

45. Steven Baca was transported to Presbyterian Hospital and permitted to decline an interview with Albuquerque officers. The Plaintiffs, whom all the Defendants knew were only witnesses, were not offered any comparable opportunity. They remained locked in police cars.

46. The Plaintiffs had been held handcuffed in police custody for hours before anyone attempted to interview them. All their belongings had been seized, their prolonged handcuffing was painful, and they were not allowed to walk around, communicate with loved ones, contact

lawyers, or even use the bathroom. One of the Plaintiffs, who had a preexisting medical condition, urinated on himself as a result of this abusive treatment.

47. The Defendants knew that the Plaintiffs were not suspects in the shooting or any other crime. Upon information and belief, federal agents present at the command post informed the Defendants that it is illegal to arrest and detain people for the purpose of obtaining their witness statements. In response, the Defendants decided to expedite the handcuffed witnesses' forced in-custody interviews by calling in more detectives rather than releasing their prisoners.

48. At approximately 11:30pm, after about three and a half hours of unlawful detention, detectives began interviewing Plaintiffs Bay, Rice, and Fitzgerald.

49. Plaintiff Bay was handcuffed in a police vehicle at the time of his interview. His handcuffs were removed only after the interview had been completed. Upon information and belief, he was released from police custody at approximately 12:46am.

50. Plaintiff Rice was told that he was being "detained" in handcuffs because officers needed to talk to him about "what the heck happened today," but the interviewing detective risibly insisted that Plaintiff Rice was "not under arrest at all."

51. Once Plaintiff Rice's interrogation ended, he asked for his property back. He was told he had to remain at the station until after Plaintiff Burks had been interviewed. He continued waiting in police custody but still did not get all his property back.

52. Plaintiff Burks was interrogated at approximately 11:48pm. Like the others, he was informed that he would only be free to leave once he had completed his "witness interview." He remained in police custody past 1:00am.

53. Plaintiffs Espinosa and Fitzgerald were held in separate police vehicles for their "witness interviews," handcuffed and unable to leave. Upon information and belief, the interviews concluded at 1:30am and the two Plaintiffs were released from custody some time afterward.

54. Plaintiff Mason was not questioned until nearly 1:00am, about five hours after his arrest. His "witness interview" lasted over an hour, concluding at approximately 2:05am. He was released from police custody some time after that.

55. While the Plaintiffs were handcuffed in police custody, but before they were even interviewed, the Defendants—particularly Defendant Keller—began publicly posting that the Plaintiffs were "vigilantes," were being investigated, would be "held accountable," and were a "hate group." Defendant Keller knew when he made these public statements that the Plaintiffs were witnesses, not suspects, and were being illegally detained mere yards from where he was Tweeting.

56. All the Defendants knew that, pursuant to a definite plan, members of NMCG were "subjects" of the June 15, 2020 operation. When the Plaintiffs failed to commit any crimes as the Defendants hoped, the Defendants arrested them anyway.

57. Defendants Keller and Nair were aware of and involved in all the relevant activities of Defendant Medina and the command post during the protest on June 15, 2020 and the Plaintiffs' detention.

58. There were dozens of witnesses near the statue at Tiguex Park. The only witnesses arrested, handcuffed, or detained were people associated with NMCG. Only the NMCG witnesses' cellphones and personal property were seized, and only the NMCG witnesses' property was searched, photographed, tested by crime scene specialists, and logged in national databases.

59. Defendants Medina, Keller, Nair, and the other Defendants present for the briefing at the command post knew that the lone shooter in the blue shirt was Steven Baca, not any of the Plaintiffs. They had known that for hours before the briefing. The command post received a detailed description of Mr. Baca during the altercation prior to the shooting; they knew that an APD detective saw the shooting and identified Mr. Baca at the scene; officers had seen dozens of people, including the Plaintiffs, point Mr. Baca out at the scene; the Defendants had seen and discussed video recordings of the shooting; and Mr. Baca himself was in custody and had made statements to the police.

60. Despite knowing that the Plaintiffs were not suspects and despite being specifically informed that witness detentions are unconstitutional, the Defendants continued detaining the Plaintiffs deliberately and pursuant to an explicit plan, made and implemented by officials authorized to do so on behalf of Defendant City of Albuquerque.

61. The Defendants' plan to target the NMCG and "anti-protestors" to the exclusion of any other groups—irrespective of the actual conduct of any of the people at the demonstration, and indeed before the demonstration even began—shows their intent to suppress certain types of speech and expression and to discriminate on the basis of the perceived political viewpoints of the targeted "subjects."

62. As a result of the Defendants' premeditated and politically-motivated plan to target and suppress certain groups, the Plaintiffs suffered false arrest and prolonged detention in obvious and known violation of their constitutional rights. They also suffered physical and emotional injuries, pain and suffering, loss of liberty and dignity, humiliation (including from Defendant Keller making public statements about their supposed involvement in a "hate group" while they were illegally detained and unable to respond), and other damages and injuries.

## COUNT I: FOURTH, FIFTH, AND FOURTEENTH AMENDMENT VIOLATIONS BY DEFENDANTS KELLER, NAIR, MEDINA, SANCHEZ, AND SANDOVAL

63. The Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

64. The Plaintiffs had a clearly-established right pursuant to the Fourth, Fifth, and Fourteenth Amendments not to be arrested and forcibly detained in handcuffs for hours without probable cause, as described above.

65. The Plaintiffs were falsely arrested and imprisoned in violation of their rights when they were handcuffed, held in police vehicles, moved from one location to another without their consent, compelled to submit to police interviews, and kept in custody for several hours without the ability to contact anyone or to meet their basic needs.

66. This detention was neither brief nor limited in scope.

67. Defendants Keller, Nair, Medina, Sanchez, and Sandoval conspired to arrest and detain the Plaintiffs and then did so without a warrant, probable cause, or exigent circumstances, in violation of the Plaintiffs' rights.

68. All the Defendants participated in and acquiesced to the false arrests and prolonged detention of the Plaintiffs, creating an affirmative link between their conduct and these violations. Upon information and belief, the law enforcement officers who physically arrested and detained the Plaintiffs did so in reliance on representations and instructions from Defendants Keller, Nair, Medina, Sanchez, and Sandoval, who—along with all the individuals present at the command post—knew that they lacked the requisite basis for the arrests.

69. The use of handcuffs and other forceful techniques against the Plaintiffs during their arrests violated their rights because they were never suspected of any crime, they posed no threat to the officers' safety, and they made no attempt to resist or evade arrest. The continuation

of that excessive use of force for the next several hours bore no relationship whatsoever to the need presented and caused serious injuries to the Plaintiffs.

70. No reasonable state actor could believe that a five- to six-hour handcuffed detention without any probable cause was constitutional, and Defendants Keller, Nair, Medina, Sanchez, and Sandoval each individually knew that they were violating the Plaintiffs' rights.

71. Defendants Keller, Nair, Medina, Sanchez, and Sandoval further knew that they were engaged in unconstitutional conduct in part because, upon information and belief, they were expressly informed by FBI agents that their conduct was illegal.

72. The Plaintiffs suffered injuries and damages as described above as a direct result of the violative actions of Defendants Keller, Nair, Medina, Sanchez, and Sandoval.

73. Defendants Keller, Nair, Medina, Sanchez, and Sandoval acted willfully, wantonly, and in gross and reckless disregard of the Plaintiffs' rights, justifying an award of punitive damages against each of them.

WHEREFORE, the Plaintiffs request compensatory and punitive damages against Defendants Keller, Nair, Medina, Sanchez, and Sandoval, as well as attorneys' fees and costs.

## COUNT II: MUNICIPAL LIABILITY

74. The Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

75. During the relevant period, Defendant Keller and the other Defendants acted as Defendant City of Albuquerque's final policymakers, such that their actions represent acts of official City policy.

76. Defendant City of Albuquerque intentionally created a policy by which it planned to falsely arrest and imprison certain individuals based on their political activity and affiliation,

and it implemented and ratified that policy many times on June 15 and 16, 2020, in a conscious and deliberate choice to disregard the risk to the individuals' constitutional rights.

77. This official policy was virtually certain to result in constitutional violations, and it proximately caused the violations of the Plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights as described above.

78. Defendant City of Albuquerque's policy and actions were willful, wanton, and in gross and reckless disregard of the Plaintiffs' rights.

WHEREFORE, the Plaintiffs request compensatory damages against Defendant City of Albuquerque, as well as attorneys' fees and costs.

### COUNT III: FIRST AMENDMENT VIOLATIONS BY DEFENDANTS MEDINA, KELLER, NAIR, AND CITY OF ALBUQUERQUE

79. The Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

80. The Plaintiffs—and any other "anti-protestors"—had a protected right under the First and Fourteenth Amendments to associate with other people in a group and to attend public events for the common advancement of political beliefs and ideas.

81. Defendants Keller, Nair, and Medina targeted the Plaintiffs to suppress NMCG's political speech and expression and to create favorable publicity for Defendant Keller's anticipated mayoral reelection campaign.

82. The plan to arrest and detain the Plaintiffs on any pretext—or without any basis at all, as ultimately transpired here—was made for the purpose of intimidating the Plaintiffs from engaging in speech and conduct protected by the First and Fourteenth Amendments.

83. Defendants Keller, Nair, and Medina intended to and did burden and penalize the Plaintiffs' group activity and expression of their political views, and engaged in a show designed

to intimidate others from expressing similar views. Defendant Keller's public statements leave no ambiguity about this political motive.

84. Defendants Keller, Nair, Medina, and City of Albuquerque had no compelling state interest in burdening and penalizing the Plaintiffs' speech by falsely arresting and detaining them.

85. During the relevant period, Defendant Keller, Nair, and Medina acted as Defendant City of Albuquerque's final policymakers, such that their actions represent an official municipal policy of intimidation and suppression.

86. The policy and plan by Defendants Keller, Nair, Medina, and City of Albuquerque was a direct cause and moving force behind the injuries and damages that the Plaintiffs suffered.

87. In the conduct described above, Defendants Keller, Nair, and Medina acted willfully, wantonly, and in gross and reckless disregard of the Plaintiffs' rights on behalf of the City of Albuquerque, justifying an award of punitive damages.

WHEREFORE, the Plaintiffs request compensatory and punitive damages against Defendants Keller, Nair, Medina, and City of Albuquerque, as well as attorneys' fees and costs, to the extent permissible by law.

### COUNT IV: STATE TORT CLAIMS AGAINST DEFENDANTS MEDINA, SANCHEZ, AND SANDOVAL

88. The Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

89. At all times relevant hereto, Defendants Medina, Sanchez, and Sandoval were law enforcement officers with APD, acting within the scope of their duties.

90. The Plaintiffs' damages and injuries were caused by the conduct of these law-enforcement officers and resulted from their acts of assault, battery, false imprisonment, false arrest, violations of the Plaintiffs' property rights, failures to comply with statutory obligations,

and violations of the Plaintiffs' constitutional rights, privileges, and immunities under both federal and state law, as described above.

91. Each Plaintiffs' arrest, detention, interrogation, and other suffering—although part of a unified scheme—was a separate and distinct occurrence, any which could have been brought to an end independent of the others.

92. Each of the occurrences described herein resulted in personal and bodily injuries and damages, as well as property deprivation and damage.

WHEREFORE, the Plaintiffs request compensatory damages against Defendants Medina, Sanchez, and Sandoval, and any other relief available by law.

## COUNT V: STATE TORT CLAIMS AGAINST DEFENDANT CITY OF ALBUQUERQUE

93. The Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

94. Defendant City of Albuquerque, acting through Defendant Keller and the other policymakers in its chain of command, had a duty to the public and to the Plaintiffs to exercise reasonable care in hiring, retaining, training, and supervising its employees and officers, including Defendant Medina and the officers of APD.

95. By its breach of these duties, Defendant City of Albuquerque was a moving force behind the constitutional and statutory violations and tortious conduct of Defendant Medina and the other APD officers, including assault, battery, conversion, false arrest, false imprisonment, and violations of the Plaintiffs' rights under the First, Second, Fourth, and Fifth Amendments and their state analogs.

96. The breach described above caused the Plaintiffs' damages and injuries.

97. Defendant City of Albuquerque is also liable for the acts of its employees when those employees have been aided in agency by the Defendant, including as police officers given

extraordinary power over New Mexico citizens when Defendant City of Albuquerque armed them with firearms, handcuffs, and badges, as here.

WHEREFORE, the Plaintiffs request compensatory damages against Defendant City of Albuquerque, as well as all costs.

Respectfully submitted,

KENNEDY, HERNANDEZ & ASSOCIATES, P.C.

 /s/Paul J. Kennedy
Paul J. Kennedy
Jessica M. Hernandez
Elizabeth A. Harrison
Henry A. Jones
201 Twelfth Street Northwest
Albuquerque, New Mexico 87102
Phone: (505) 842-8662
Fax:    (505) 842-0653

*Attorneys for the Plaintiffs*