# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

DEVON BAY, JOHN BURKS, DANIEL
ESPINOSA, CRAIG FITZGERALD,
JOEL MASON, and DAVID RICE,

       Plaintiffs,

       v.                                  No.1:21-cv-00885-KWR-SCY

TIM KELLER, SARITA NAIR, HAROLD MEDINA,
ARTURO SANCHEZ, ALBERT SANDOVAL,
KELSEY LUECKENHOFF, MICHAEL LUNA,
ROBERT STOCKTON, JOSH ROGERS, ANA
BRUCIAGA, HECTOR GUERRERO, JAMES
EDISON, ADAM GOLSON, LORI GRUBE,
RANDALL KIMMINAU, SOPHIA RIDER, SEAN
ROTH, ARNIEL SAMPANG, TOMAS URIOSTE,
UNKNOWN APD LAW ENFORCEMENT AGENTS,
and the CITY OF ALBUQUERQUE,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court upon Defendants' Motion for Summary

Judgment Requesting Dismissal of Plaintiffs' Amended Complaint (**Doc. 27**), filed February 1,

2022, and Plaintiffs' Motion for Partial Summary Judgment (**Doc. 42**), filed March 24, 2022.

Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants'

motion is well-taken in part and, therefore, is **GRANTED IN PART**. Count I, II, and III are

**DISMISSED WITH PREJUDICE**. Plaintiffs' Motion is not well taken and is **DENIED**.

## BACKGROUND

This case arises from protests in Albuquerque, New Mexico on June 15, 2020

surrounding the removal of a statute of Juan de Oñate, a Spanish conquistador. Plaintiffs Devon

Bay, John Burks, Daniel Espinosa, Craig Fitzgerald, Joel Mason, and David Rice attended the protests. Plaintiffs allege that prior to these protests, officials within the Albuquerque Police Department ("APD"), the Mayor of the City of Albuquerque, and the City's Chief Administrative Officer targeted Plaintiffs for arrest. Plaintiffs allege that after a shooting occurred during the protests, to which Plaintiffs maintain they were not involved, Defendants (1) arrested and forcibly detained them in handcuffs for hours without probable cause, (2) falsely arrested and imprisoned Plaintiffs by keeping them detained after they knew there was no probable cause, and compelled Plaintiffs to submit to police interviews, and (3) kept Plaintiffs in handcuffs for hours, thus, using excessive force and causing Plaintiffs serious injuries. As a result, Plaintiffs assert the following six claims:

| | | |
|---|---|---|
| Count I: | Fourth, Fifth, and Fourteenth Amendment Violations by Defendants Keller, Nair, Medina, Sanchez, and Sandoval | |
| Count II: | Fourth, Fifth, and Fourteenth Amendment Violations by Defendants Lueckenhoff, Luna, Stockton, Rogers, Bruciaga, and Guerrero | |
| Count III: | Fourth, Fifth, and Fourteenth Amendment Violations by Defendants Edison, Golson, Grube, Kimminau, Rider, Roth, Sampang, Urioste, and Unknown APD Law Enforcement Agents | |
| Count IV: | Municipal Liability against Defendant City of Albuquerque | |
| Count V: | State Tort Claims against Defendants Medina, Sanchez, Sandoval, Lueckenhoff, Luna, Stockton, Rogers, Bruciaga, Guerrero, Edison, Golson, Grube, Kimminau, Rider, Roth, Sampang, Urioste, and Unknown APD Law Enforcement Agents | |
| Count VI: | State Tort Claims against Defendant City of Albuquerque | |

Defendants Tim Keller, Sarita Nair, Harold Medina, Arturo Sanchez, Albert Sandoval, Kelsey Luekenhoff, Michael Luna, Robert Stockton, Josh Rogers, Ana Bruciaga, Hector Guerrero, Adam Golson, Lori Grube, Randall Kimminau, Sean Roth, Arniel Sampang, and

Tomas Urioste[1] now file the instant motion for summary judgment asserting qualified immunity

on Counts I, II, III, and V. *See* **Doc. 27**. Plaintiffs filed a cross-motion for summary judgment on

the Fourth Amendment claims asserted in Counts II and III. *See* **Doc. 42**.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A fact is material if it could have an effect on the outcome of the suit. *See Smothers v.*

*Solvay Chemicals, Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). "A dispute over a material fact is

genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."

*Id.* (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine

issue of material fact. *See Shapolia v. Los Alamos Nat. Lab'y*, 992 F.2d 1033, 1036 (10th Cir.

1993). Once the moving party meets its initial burden, the non-movant cannot "rest on the

pleadings[,] but must set forth specific facts by reference to affidavits, deposition transcripts, or

other exhibits to support the claim." *See Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1151

(10th Cir. 2006). "[A] complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial," and the moving party will

be entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323

(1986).

On summary judgment, a court is to view the facts in the light most favorable to the non-

moving party and draw all reasonable inferences in favor of that party. *See Shero v. City of*

---

[1] This group does not include the City of Albuquerque, and does not include the "fictitious defendants," Unknown APD
Law Enforcement Agents, or Defendants James Edison or Sophia Rider because Defendants assert Plaintiffs have not
yet identified the unnamed defendants, nor have they served Defendants Edison and Rider. *See* **Doc. 27, at 1 n.1**.

*Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot weigh the evidence and determine the truth of the matter, but instead, must determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## UNDISPUTED MATERIAL FACTS[2]

The Court may consider only admissible evidence when ruling on a summary judgment motion. *See Johnson v. Weld County*, 594 F.3d 1202, 1209 (10th Cir. 2010); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Although "the form of evidence produced by a nonmoving party at summary judgment may not need to be admissible at trial, the content or substance of the evidence must be admissible." *Johnson*, 594 F.3d at 1210 (internal quotations and emphasis omitted).

Additionally, the Court may disregard a party's version of the facts which are clearly unsupported by the record. "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotations and alteration omitted) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

Here, the parties in many of their disputes do not dispute the facts so much a characterize or qualify them differently. After a close review of hours of video and audio evidence, the Court

---

[2] Disputes concerning the facts are noted where relevant.

did not adopt the parties' characterization where clearly contradicted by the record, and omitted

extraneous detail, party arguments, and opinions presented as facts.

### **Plaintiffs and the Lead up to the Demonstration**

Plaintiffs Devon Bay, John Burks, Daniel Espinosa, Craig Fitzgerald, Joel Mason, and

David Rice are members of, or associate with members of, the "New Mexico Civil Guard."

Plaintiff Burks is the "captain" of the group. The New Mexico Civil Guard is a self-described

"constitutional militia" unit. **Doc. 27-3, Ex. C, at 2**. The group is not an organized police force

or part of the military, nor is it affiliated with or supervised by any government entity. Plaintiffs

are not certified law enforcement officers.

An event called "Prayer Gathering for the Removal of the Don Juan de Oñate statue" was

organized by a group of demonstrators, and scheduled for June 15, 2020 at 6 PM at Tiguex Park

and Albuquerque Museum in Albuquerque, New Mexico. **Doc. 27-1, Ex. A**. APD noted that

organizers promoting the event described it as a "[p]eaceful protest to call for the removal of the

Don Juan de Onate statue." *Id.* **at 2**.

The Albuquerque Police Department Emergency Response Team and Tactical Team,

among other divisions, would cover the event. In preparation for the gathering, APD Lt. Joseph

Viers, the event's Incident Commander, prepared an "Event Action Plan." The plan provided

"Rules of Engagement" and stated that the APD Emergency Response Team would only engage

"if there is a threat to life or if major property damage occurs." *Id.* **at 2, 5–6**. "Damage to the

statue [would] be considered minor property damage and [would] not elicit" a response from the

Emergency Response Team; while damage to the Albuquerque Museum would be "considered

major property damage due to there being high value historical items inside that cannot be

replaced." *Id.* **at 4**.

Separately, prior to the event, a text message exchange occurred between Chief of Police Harold Medina and an APD spokesperson concerning the demonstration. The APD spokesperson noted that things "will turn out really bad if those jokers [the New Mexico Civil Guard] assault the protestors. Even the intimidation is troubling. Any ideas about de-escalating and getting them to back down?"  Chief Medina replied: "We are planning it [sic] stay neutral. The moment the[y] commit a crime[,] cat team will move in and 16 them."[3]  **Doc. 33-1, Ex. 1**.

### **The Start of the Demonstration**

Plaintiffs, as part of a group of seven men, attended the June 15, 2020 demonstration with the aim to "keep the peace," **Doc. 27-3, Ex. C, at 2**, and prevent or discourage vandalism. **Doc. 27-2, Ex. B, at 3**; **Doc. 27-4, Ex. D, at 2**. Each Plaintiff arrived at the demonstration armed, and all but one was wearing body armor and military style uniform; Plaintiff Fitzgerald was dressed in a gray t-shirt and jeans. Plaintiff Espinosa was armed with a sidearm, a 9mm, and an AR-15. **Doc. 27-5, Ex. E, at 2**. Plaintiff Fitzgerald was armed with a sidearm and an AK-style long rifle. **Doc. 27-4, Ex. D, at 2**; **Doc. 34, Ex. 22, at 3:13**. Plaintiff Mason was armed with two guns, a ".22 and a 9[mm]." **Doc. 27-6, Ex. F, at 2**. Plaintiff Bay was also armed with a rifle. **Doc. 43, Ex. 10, at 10:15**. Plaintiff Burks was armed with an AR-15 and a "glock." **Doc. 43, Ex. 25, at 2:08**. Plaintiff Rice was armed with unspecified weapons.

Undercover officers from the APD attended the event and some were staged nearby in the Albuquerque Museum. **Doc. 43, Ex. 18**. Between 5:20 PM to 5:56 PM, members of the public began to call 911 to report the presence of armed individuals at the event. APD's communication dispatcher relayed this information to Incident Commander Viers. Shortly after this information was relayed, APD Det. Daniel Porter, who was conducting surveillance at the event, reported

---

[3] Plaintiffs assert that "16" refers to "10-16," which means to take a "prisoner" into custody. *See* **Doc. 22, ¶ 27**.

over the radio that there was a male subject in camouflage carrying a rifle with a rifle at 19th and

Mountain. Seven minutes later, Emergency Response Team member, Sgt. Michael Alstad

reported seeing subjects in camouflage with the rifle. **Doc. 27-12, Ex. L**; **Doc. 27-13, Ex. M**;

**Doc. 27-14, Ex. N**; **Doc. 47, Ex. AA**; **Doc. 46-8, Ex. BB**.[4]

Tactical Unit Commander Arturo Sanchez was monitoring the APD radio

communications and heard an audio report conveying the presence of multiple individuals

dressed in camouflage uniforms who were armed with rifles at the demonstration. Commander

Sanchez found the presence of these armed individuals concerning so he contacted Commander

Viers to see if he needed the Tactical Team to provide support for the Emergency Response

Team. Commander Viers advised Commander Sanchez that the New Mexico Civil Guard was

present at the demonstration to protect the Don Juan de Oñate statue from destruction, and he

told him that the Emergency Response Team would respond in the event the protest became

unruly. **Doc. 27-15, Ex. O**.

Commander Sanchez told Commander Viers that he would have the Tactical Team stand

by so that the team could be utilized in the event that rescue or extraction was needed should

there be an active shooter within the crowd. After speaking with Incident Commander Viers,

Sanchez contacted Lt. Albert Sandoval and they agreed to have the Tactical Team activated and

only deployed if there was an active shooter within the crowd of protestors, if an officer or

citizen needed immediate rescue, or if deployment was necessary to prevent major property

---

[4] Plaintiffs objected to Defendants' citation to transcripts of police radio communications because Defendants failed to disclose or submit the primary audio file into evidence, and because the documents are inadmissible under the best evidence rule and are hearsay. *See* **Doc. 33, at 5**. Defendants submitted the audio of radio transmissions and the declaration of the APD Communications Records and Data Coordinator. *See* **Doc. 47, Ex. AA**; **Doc. 46-8, Ex. BB**. The Court has reviewed the declaration and listened to the audio file, and now overrules Plaintiffs' objection.

damage to commercial or residential structures. Commander Sanchez and Lt. Sandoval continued to monitor the radio communications. *See **id.***

At approximately 6:33 PM, Det. Porter conveyed over the radio that there were four subjects with rifles at 19th Street and Mountain. At approximately 7:10 PM, another member of the public called about the presence of the armed gunmen dressed in fatigues at the demonstration. This information was conveyed to officers through APD radio communications. **Doc. 27-13, Ex. M**; **Doc. 27-16, Ex. P**; **Doc. 47, Ex. AA**.

### Reports of Conflicts and a Shooting at the Demonstration

At 7:56 PM, Commander Viers reported that there was a subject with a pickaxe hitting the ground next to the Don Juan de Oñate statue. **Doc. 27-14, Ex. N, at 1**; **Doc. 47, Ex. AA, at 2:13**. At 7:58 PM, a member of the public called 911 to report that the demonstration was getting violent from a fight, and this information was conveyed to officers via APD radio communications.

Plaintiffs had surrounded the statute to prevent it from being taken down by demonstrators. *See* **Doc. 27-5, Ex. E, at 2**. A man in a blue shirt with a brown scarf stood to the left and near New Mexico Civil Guard members at the base of the statute. *See* **Doc. 28, Ex. R**; **Doc. 46-3, Ex. R1**. According to Plaintiff Bay, the demonstration "got real bad real fast right around when [demonstrators opposed to Don Juan de Oñate] were trying to pull that statue down." **Doc. 27-2, Ex. B, at 4**. There were several New Mexico Civil Guard members at the base of the statute engaged in verbal altercations with other protestors. Another New Mexico Civil Guard member was standing on an elevated area near the statute, attempting to take the pickaxe from the man wielding it and also attempting to physically prevent demonstrators from having any contact with the statute. *See* **Doc. 28, Ex. R**; **Doc. 33-5, Ex. 5, at 1**. A few of the

New Mexico Civil Guard members were in a "little scuffle" with individuals, as New Mexico Civil Guard members sought to protect the statute, while opposition protestors sought to approach it or tear it down. *See* **Doc. 50-1, Ex. C, at 1**; **Doc. 50-7, Ex. II, at 2–3**; **Doc. 27-5, Ex. E, at 2–3**. New Mexico Civil Guard members were "up close to the statue…kind of just leaning on it trying to protect it, and they just got overran." **Doc. 27-5, Ex. E, at 2**. Plaintiffs Burks concluded that people "were starting to get thrown around," so he ordered members of the New Mexico Civil Guard to "[s]tep back," move away, and he then allowed opposition protestors to "have" the statute. **Doc. 50-1, Ex. C, at 1**.

At approximately 8:00 PM, the man with the blue shirt and brown scarf, later identified as Steven Ray Baca, got into a physical altercation with several demonstrators. *See* **Doc. 34, Ex. 19, at 0:03**. As the altercation continued, Baca ran away from the statute and into the street, drew a black handgun, and shot another man. *Id.* **at 0:36–0:42**. Plaintiffs were not near Baca when he fired his handgun. *Id.*

Plaintiff Espinosa,[5] who was already on the phone with 911 when the shooting occurred, informed the 911 operator that an individual had been shot. *See* **Doc. 34, Ex. 17, at 6:32**. An unidentified speaker in the background can be heard telling Plaintiff Espinosa that a man "right there in the blue" shot someone. *Id.* **at 9:58**. When the 911 operator asks Plaintiff Espinosa if he knows who fired the shots, Plaintiff Espinosa replied: "I don't know, I'm getting conflicting…stories here." *Id.* **at 10:19**.

Immediately after the shooting, Plaintiffs ran towards the shots and formed a perimeter around Baca to protect him from the group of demonstrators. Plaintiffs sought to "secure[] the

---

[5] Defendants argue that Plaintiffs failed to establish that the phone call was made by Plaintiff Espinosa. *See* **Doc. 50, at 2 – 3**. The Court finds that the evidence presented by Plaintiffs, including the first name of the caller, the phone number used, the caller's use of "we" when referring to armed demonstrators, and Plaintiff Espinosa's corroborating statements during his APD interview, establishes that Espinosa likely made the call.

area" until law enforcement officers arrived on scene, **Doc. 46-1, Ex. D**, and make sure the "shooter didn't get attacked any further." **Doc. 27-7, Ex. G, at 2–3**; **Doc. 27-3, Ex. C, at 4**. Plaintiff Burks secured Baca's weapon and told him: "Look, dude, I love you, but I'll shoot you…don't do anything." **Doc. 27-3, Ex. C, at 4**. As Plaintiffs surrounded Baca, one other New Mexico Civil Guard member helped administer medical aid to the shooting victim.

At approximately 8:04 PM, Det. Porter communicated over APD radio that shots had been fired at the demonstration. *See* **Doc. 27-14, Ex. N, at 2**; **Doc. 47, Ex. AA, at 2:54**. Commander Sanchez instructed the Tactical Team to "go ahead and move in," as did Commander Viers to the Emergency Response Team. **Doc. 27-14, Ex. N, at 2**; **Doc. 47, Ex. AA, at 3:01**. As both teams received authorization to go to the site of the shooting, Det. Porter reported: "subject's reloading." **Doc. 47, Ex. AA, at 3:11**.

An officer asked for a "description and area in the crowd" of the shooter, *id.* **at 3:15**, and Det. Porter said: "Just west of 19th and Mountain. Unsure exactly which one shot." *Id.* **at 3:19**. There was pause in the radio transmission, and Det. Porter then stated: "It's going to be coming from one of the rifles…"[6]  *Id.* **at 3:23**. Commander Sanchez then directed that "anybody with a rifle" should be taken into custody. *Id.* **at 3:32**. APD dispatchers communicated over the radio that someone called 911 to report that someone was on the ground who was possibly shot. **Doc. 27-14, Ex. N, at 2**.

The Tactical and Emergency Response teams deployed to scene, arriving between 8:05 and 8:07 PM. One set of officers approached the victim to provide aid. Demonstrators in the

---

[6] The parties dispute the exact transcription of the speaker's communication. Plaintiffs assert the speaker said: "So it's coming from one of the rifles?"  *See* **Doc. 42, ¶ 7**. The Court has reviewed the audio, and concludes that Plaintiffs' interpretation is not supported by the audio transmission. *See* **Doc. 47, Ex. AA**.

crowd can be heard telling officers that "they…shot at us." *See* **Doc. 43, Ex. 11, at 1:48**. While receiving medical aid at the scene, the victim stated that he was shot with a 9mm. *Id.* **at 2:09**.[7]

Tactical Team members arrived on scene and observed Plaintiffs, who were armed, surrounding Baca, and the Tactical Team told them to keep their hands up and to lie down. **Doc. 28, Ex. S, at 0:30**. A member of the public wearing a white shirt also pointed out the presence of other members of the Civil Guard to the Tactical Team. *Id.* **at 0:37**.

Sgt. Mike Hernandez directed that Tactical Team members handcuff armed individuals. *Id.* **at 1:09**. Sgt. Hernandez then observed another armed member of the New Mexico Civil Guard walking towards the shooting scene, so he told him to lie down on the ground. *Id.* **at 1:17**. Plaintiffs Espinosa and Fitzgerald had their hands secured by zip-ties and the remainder of the Plaintiffs handcuffed. Plaintiffs were then patted down for weapons and detained by members of the Tactical Team.

At 8:08 PM, a member of the public called 911, and the APD dispatcher noted that the caller advised a man was being attacked by multiple people before firing a shot at the victim. *See* **Doc. 27-13, Ex. N, at 6**. The APD dispatcher also noted that the description provided of the subject was white male, aged 25 to 30, 5'8", with a black handgun and wearing a blue shirt and dark green shorts. At 8:10 PM, another member of the public called to report the shooting, and the APD dispatcher noted that the description provided was a 30- to 40-year-old male wearing a "hai blu[e]" shirt and shorts. *Id.*

By 8:20 PM, Plaintiffs were restrained and unresisting, had been placed near armored vehicles, and any weapons found by officers were locked inside armored vehicles. At some

---

[7] The victim was surrounded by officers providing medical aid, and his father, and the parties dispute whether this statement was made to the officers or his father.

point, a video of the shooting was posted onto the social media platform, Twitter. *See* **Doc. 42-1, Ex. 1, at 3**.

### Plaintiffs are Placed in Police Vehicles and Moved from the Scene

Sgt. Hernandez then contacted Lt. Sandoval over the radio and informed him that he wanted to move all detained individuals to San Felipe Street. **Doc. 28, Ex. S, at 2:30**. Lt. Sandoval agreed, so he requested that police units come to scene to transport Plaintiffs. Sgt. Hernandez then conveyed over the radio that he was going to secure and collect weapons from Plaintiffs, and have Plaintiffs taken to San Felipe Street because a large crowd had formed around them. *Id.* **at 3:04**.

As the Tactical Team waited for officers to transport Plaintiffs, the crowd became increasingly hostile towards Plaintiffs. Some members of the public accused Plaintiffs of being involved in the shooting, and Plaintiffs were moved towards the Tactical Team's armored vehicles due crowd's hostility. The crowd continued to be confrontational after Plaintiffs were moved to the armored vehicles. However, the Tactical Team deployed smoke to push the crowd back, and the crowd dispersed. *Id.* **at 21:20**.

Commander Sanchez then requested that Officer Shaune Reese go to the shooting scene to pick up one of the New Mexico Civil Guard members who was detained. **Doc. 28, Ex. T, at 6:55**. Officer Reese drove to the scene as directed, and a Tactical Team member brought Plaintiff Rice to his police vehicle. *Id.* **at 7:04**. The Tactical Team officer then patted down Plaintiff Rice and Officer Reese removed the tactical vest Plaintiff Rice was wearing. *Id.* **at 8:42**. Officer Reese then drove Plaintiff Rice to the intersection of Mountain and San Felipe Street where he remained inside of Officer Reese's police vehicle.

Tactical Team members then escorted Plaintiffs Bay, Fitzgerald, Espinosa, and Mason to Officers Arniel Sampang and Adam Golson's police vehicles which were parked on Mountain Road, west of the scene of the shooting. **Doc. 28, Ex. U1, at 3:23**; **Doc. 28, Ex. V, at 0:56**. Plaintiffs Bay and Fitzgerald were patted down and placed in Officer Sampang's vehicle. Plaintiffs Espinosa and Mason were patted down and placed in Officer Golson's vehicle. A Tactical Team member escorted Plaintiff Burks to Officer Tomas Urioste's vehicle where he was patted down and then placed inside the officer's vehicle. **Doc. 28, Ex. W, at 0:27**. In sum, the officers collected Plaintiffs' wallets, identification, cellphones, keys, and other personal effects, and placed these items in the officers' vehicles.

At 8:39 PM, an officer announced over radio communications: "Just FYI, apparently we may have a detective that will be able to identify the offender, so…we'll work on that in a little bit." **Doc. 47, Ex. AA, at 24:53**; **Doc. 43, Ex. 12, at 14:16**.

At 9:08 PM, while Plaintiff Mason was in a police vehicle still at the scene, APD Det. Thomas Vigil approached him and asked if he had video footage on his cellphone. **Doc. 34, Ex. 18, at 0:30**. Plaintiff Mason asked whether he could "go home" if he showed officers the video. The detective responded that they planned to meet Plaintiffs at the APD police station to "have a chit-chat." *Id.* **at 0:50**. Plaintiff Mason asked if they were being "book[ed]," to which the detective responded no. *Id.* At 9:10 PM, Plaintiff Mason allowed the detective to access his phone and showed the officer cellphone video he recorded which showed "the guy with the gun shooting" and "the guy in the blue shirt." *Id.* **at 2:00**. After watching the video, the detective took Plaintiff Mason's cell phone and left him handcuffed in the police car. Det. Vigil then gave Plaintiff Mason's cellphone to Det. Kelsey Lueckenhoff.

While still on scene, an employee of the Albuquerque Museum approached Det. Vigil and informed him that security footage was available from the Museum's security cameras. **Doc. 33-8, Ex. 8, at 2**. Det. Vigil concluded that "[d]ue to the still active protest going on, it was decided that the security cameras would be accessed at a different time." ***Id.***

**Plaintiffs are Moved to the Albuquerque Police Station**

Commander Sanchez concluded that "[b]ecause the scene was not secured and because the crowd had not fully dispersed," Plaintiffs should be transported to the Albuquerque Police Station "so that detectives could conduct their investigation into their involvement, if any, with the shooting." **Doc. 27-15, Ex. O, ¶ 32**.[8]

Officer Golson transported Plaintiff Espinosa to the police station, while Officer Sampang transported Plaintiff Fitzgerald and Officer Urioste transported Plaintiff Burks. Meanwhile, Officer Roth drove to the area of Rio Grande Boulevard and Mountain Road, where he picked up Plaintiff Bay and transported him to the police station. Officer Hence Williams drove to pick up Plaintiff Mason and transported him to the police station. Officer Randall Kimminau picked Plaintiff Rice up and drove him to the main police station. Around 9:15 PM, Plaintiffs began arriving at and were escorted inside the police station. *See* **Doc. 34, Ex. 20**.[9] Baca was also transported to the police station.

Once inside, APD officers placed Baca and Plaintiff Mason in holding cells. On the way to the holding cell, at around 9:27 PM, Baca saw Plaintiff Mason and told officers, "We're not

---

[8] Plaintiffs dispute that they were transported to the police station to determine their involvement in the shooting and assert that APD knew that Baca, not Plaintiffs, was the shooter before Plaintiffs were transported to the police station. *See* **Doc. 33, at 9**. However, that Plaintiff Mason showed Det. Vigil a video of the shooting and that an undercover officer stated that he viewed Baca with a handgun after the shooting but did not view the shooting itself does not controvert the fact APD decided to investigate Plaintiffs "involvement, **if any**, with the shooting."

[9] Plaintiffs assert that at 8:45 PM, APD officers transported them to the police station. *See* **Doc. 33, at 11–12**. However, the record cited does not support the time of Plaintiffs' asserted transport; the lapel video cited captures Plaintiffs arriving at the police station around 03:15 UTC, corresponding with 9:15 PM MT. *See* **Doc. 34, Ex. 20**.

together. We don't know each other…Yeah, we're not together." **Doc. 43, Ex. 23, at 1:26**.

Minutes later, an officer handcuffed one hand of Plaintiff Mason's to a pole in the holding cell.

**Doc. 43, Ex. 29, at 3:20**.

Meanwhile, officers escorted Plaintiffs Bay, Burks, Espinosa, Fitzgerald, and Rice back

to patrol vehicles parked on the street outside of the APD police station and left their hands

restrained. *See* **Doc. 34, Ex. 20, at 6:30**. These Plaintiffs remained in the vehicles for another

two hours after Baca was escorted into the station.

After Plaintiffs were secured in the vehicles, at around 9:24 PM, a group of officers[10]

gathered and briefly discussed the events. **Doc. 34, Ex. 21**. The group of officers, at times, speak

over each other or engage in simultaneous conversations. One officer asked, "whose 16 did you

take?" Another responded, "I have no idea." One officer stated they had the "army, camo

brown" individuals, and while another stated they had "Steven…Baca." One of the officers then

asked, "isn't that the dude in the blue shirt?" An officer responded, "blue shirt, I'm pretty sure,

was the shooter." A different officer then asks, "so who was the nearest to him?" and "do we

know which defender was nearest to him?" *Id.* **at 1:26**.[11]

**<u>The Manner of Plaintiffs' Restraints</u>**

Plaintiff Bay's handcuffs "caused [him] physical pain and discomfort." **Doc. 42-4, Ex. 4,**

**¶ 4**.

Plaintiff Rice felt like he was "cuffed in a painful configuration, as if [he] were a

combatant." **Doc. 42-9, Ex. 9, ¶ 3**. Plaintiff Rice made one reference to his handcuffs. At around

8:48 PM, Officer Reese asked Rice if he was doing alright, and Rice responded in the

---

[10] Plaintiffs assert that these officers were the "Detaining Defendants." *See* **Doc. 42, at 6–7**.

[11] Plaintiffs argue that this conversation shows that by 9:25 PM, APD officers were aware that the man "in the blue shirt" was the shooter, not any Plaintiff. **Doc. 33, at 12; Doc. 42, at 6–7**. Defendants argue that "it is clear from the video that not all officers depicted were discussing whether Baca was the shooter." **Doc. 46, at 11; Doc. 50, at 7**.

affirmative, saying, "finally got the bracelets [handcuffs] off that hurt." **Doc. 28, Ex. T, at 36:14**. Officer Reese then asked Plaintiff Rice if his handcuffs were too tight, but Rice did not indicate that they were. *Id.* **at 36:25**. Officer Reece told Rice that he could put on another set of handcuffs to give Rice more room. *Id.* **at 37:05**. At around 8:53 PM, Officer Reese adjusted Plaintiff Rice's handcuffs. *Id.* **at 40:30**. As Officer Reese adjusted Rice's handcuffs, Rice laughed and conversed with Reese; but when Reese attempted to link the handcuffs, Rice groaned in pain. *Id.* **at 41:40**. After the adjustment process, Plaintiff Rice told Officer Reece his handcuffs were more comfortable. *Id.* **at 42:03, 42:40**.

Plaintiff Mason told officers he "couldn't feel [his] hands because of the handcuffing," and alleges that he also told officers he had a disability.[12] **Doc. 42-8, Ex. 8, ¶ 3**. At around 9:22 PM, Officer Williams adjusted Plaintiff Mason's handcuffs. **Doc. 28, Ex. Y, at 1:24**.

Plaintiff Espinosa, initially secured with zip-ties, asked officers "several times to loosen the zip-ties or to get [him] handcuffs instead." **Doc. 42-6, Ex. 6, ¶ 4**. Espinosa felt that the pain to his "wrists and arms from the zip-ties was nearly unbearable." *Id.* At around 9:33 PM, Officer Golson removed the zip-ties securing Plaintiff Espinosa's hands. **Doc. 43, Ex. 26, at 1:20**; **Doc. 50-3, Ex. EE, ¶ 11**. Plaintiff Espinosa was then handcuffed. **Doc. 43, Ex. 26, at 1:48**.

Plaintiff Burks told Officer Urioste that his "handcuffing was causing [him] pain and discomfort." **Doc. 42-5, Ex. 5, ¶ 4**. At around 8:56 PM, Burks showed his handcuffs to Officer Urioste and informed him that his handcuffs were causing his index knuckles to come together. **Doc. 43, Ex. 25, at 0:30**. Earlier, Burks had informed Officer Urioste that he had been diagnosed

---

[12] Defendants dispute that Plaintiff Mason complained of pain or that he was handcuffed too tight. **Doc. 50, at 8**. In support of his content, Plaintiff Mason references video footage of an interaction between Mason and Williams. *See* **Doc. 28, Ex. Y**. Due to excessive background noise, it is difficult to make out Plaintiff Mason's words, however, the Court can make out the words: "can't even move my hands." *Id.* **at 1:05**. However, the video does not support Plaintiff's contention that he told the officer that he had a disability.

with Post-Traumatic Stress Disorder. **Doc. 43, Ex. 24, at 1:36**. Officer Urioste asked Burks to step out of the vehicle so that he could adjust his handcuffs. Officer Urioste then asked whether Burks wanted Urioste to take off his "gear" so that Burks could "sit comfortably" in the vehicle. **Doc. 43, Ex. 25, at 0:41**. Burks replied, "yeah, that's fine." Officer Urioste then took off some of the body gear Burks was wearing and adjusted his handcuffs. *Id.* **at 1:53**.

At around 9:43 PM, Officer Urioste returned to the vehicle. Plaintiff Burks mentioned his shoulder. Officer Urioste then asked Plaintiff Burks if he wanted to be "double cuff[ed]." Officer Urioste stated it would allow Burks' hands "to be a little more separated." Burks responded in the affirmative. Officer Urioste then handcuffed Burks with two sets of handcuffs, adjacent to and linking with each other, so that Burks now had greater space between his cuffed hands. **Doc. 43, Ex. 27, at 0:32**. Officer Urioste returned Burks to the vehicle and told him that he had to wait to be interviewed. *Id.* **at 1:47**. Plaintiff Burks responded saying, "We don't even know [Baca] … He's not involved with us at all." *Id.* **at 1:54**. Officer Urioste replied that he did not see anyone matching Baca's description and did not know who Burks was referencing. *Id.* **at 2:04**. Officer Urioste told Burks to let the APD interviews know about the information Burks had because Burks "kn[e]w more" than Urioste did. *Id.* **at 2:21**.

Plaintiff Fitzgerald told Officers Sampang and Urioste that he had "MS [multiple sclerosis] and incontinence" and asked not to be left in the vehicle because he "might need to use the bathroom on short notice." **Doc. 42-7, Ex. 7, ¶ 4**; **Doc. 51, Ex. U3, at 0:43**. At around 9:45 PM, Officers Sampang and Urioste escorted Fitzgerald, who urgently needed to urinate, into the police station to use the restroom. **Doc. 51, Ex. U3, at 1:00**. Officers had to remove Fitzgerald's zip-ties before he could use the restroom. *Id.* **at 2:00**. At around 9:50 PM, after Plaintiff Fitzgerald had used the restroom, Officer Sampang replaced his zip-ties with handcuffs. *Id.* **at**

**4:45**. Later, Plaintiff Fitzgerald needed to use the restroom again. He "tried to bang against the door and window," but was unable to get an officer's attention. **Doc. 42-7, Ex. 7, ¶ 5**. As a result, Fitzgerald urinated on himself while handcuffed in the vehicle. **Doc. 43, Ex. 21, at 0:45**. Fitzgerald explained that after officers took him to the restroom, he was in the vehicle for about 30 minutes and Officer Urioste returned to ask him if he was okay. **Doc. 34, Ex. 22, at 18:00**; **Doc. 43, Ex. 21, at 1:01**. Fitzgerald responded that he was. However, five minutes later, Fitzgerald needed to use the restroom again, but found that by the time he got an officer's attention, he had already relieved himself. **Doc. 34, Ex. 22, at 18:00**. At around 10:46 PM, Officer Sampang returned to his vehicle and escorted Plaintiff Fitzgerald to the restroom again. **Doc. 43, Ex. 21, at 0:45**, **4:00**.

### APD Holds a Briefing at the Albuquerque Police Station

Shortly before 9 PM, Det. Michael Luna received a phone call from Sgt. R. Ingram who told him that "the 'shooter' and witnesses had been transported to the [Albuquerque Police Station] to be interviewed." **Doc. 33-9, Ex. 9, at 1**. Sgt. Ingram directed Det. Luna to go to the Albuquerque Police Station.

At 9:42 PM, Det. Luna arrived at the Albuquerque Police Station for an initial briefing. The briefing was delayed so that agents from the Federal Bureau of Investigation could arrive and investigate the circumstances of the shooting. **Doc. 50-6, Ex. HH, at 1**. The briefing started at 10:28 PM in the police department conference room. The briefing attendees included Dets. Lueckenhoff, Luna, Josh Rogers and Hector Guerrero, among others. *See* **Doc. 33-7, Ex. 7, at 1**; **Doc. 33-10, Ex. 10, at 1**; **Doc. 50-6, Ex. HH, at 1**. The briefing was given by detectives who were on the scene at the time of the shooting, and they recounted what they had observed at the demonstration.

At approximately 11:12 PM, Det. Lueckenhoff watched video footage of the shooting posted to the Twitter account of a news reporter, and she then directed APD Impact detectives to interview New Mexico Civil Guard members. **Doc. 50-6, Ex. HH, at 1**. The officers who attended and conducted surveillance the demonstration also wrote reports detailing their observations. The Court provides the details of these reports where relevant. The first officer recounted that[13]:

> I observed the male wearing the blue sport tees shirt and dark colored shirts [sic]…[make] it to the intersection of 20th and Mountain RD just west where he was tackled to the ground…**I observed the male on the ground reach under his shirt area where a** [sic] **he drew a black in color handgun and extended his arms out and began to discharge the firearm about 5-6 times**. One the males who was hitting him with the skate board fell to the ground as if he had been struck by gunfire and the other male in all black as well as the crowd fled back east on Mountain RD NW. I observed 5-6 males who dressed in military style clothing armed with rifles advance towards the male that had just discharged his firearm. The male them began to what looked like manipulate the firearm as to unload or reload it and place it on the ground. The 5-6 males dressed in military style clothing secured the handgun by stepping on it and kept the crowd from attacking the male who was once again sitting on the ground.
>
> **All this information was relayed to the command post** where I observed tactical teams and ERT teams advance on the male who was laying on the ground and on the males who were armed.

*See* **Doc. 33-2, Ex. 2** (emphasis added).

The second officer recounted:

> I heard…someone being struck by a skateboard. Seconds after what I believed was an impact, **I heard 4 - 5 gunshots that sounded to have come from a handgun. I advised over the radio that there had been shots fired**. I heard screams as I viewed several people running back eastbound on Mountain, including the male subject I initially viewed with the skateboard. **Unknown as to who fired the shots**[,] I began reversing my truck from the parking space in an attempt to assess the scene. **I advised over the radio that I viewed one of the civil guard members pointing his rifle westbound and looking through his scope, appearing to take aim on something. I quickly looked to the west and viewed Baca kneeling on the ground. He was holding, what appeared to be a**

---

[13] Plaintiffs labeled these reports "Undercover Officer Report 1," "Undercover Officer Report 2," and so on, and the Court refers to the officers sequentially for consistency.

**handgun, in his right hand**. It appeared he was manipulating the firearm and then placed it on the ground. Baca then retrieved his cell phone. The civil guard members closed distance on Baca and appeared to be pointing their rifles at him for a brief second until they got closer. The civil guard members then made what appeared to be a modified circle around Baca in an attempt to keep anyone from getting close to him…

I was contacted by Gang Violence Reduction Unit Detective T. Vigil and asked if I saw the male subject who fired the shots. I responded to the area of Mountain and Rio Grande where multiple subjects were in custody. I viewed Baca and advised Detective Vigil that he was **positively the subject I viewed in the altercation with the group. I also advised that although I did not see him shoot the weapon, he was who I viewed to have a handgun in his hand after the incident**.

*See* **Doc. 33-5, Ex. 5** (emphasis added).

The third officer recounted:

I observed a male subject wearing military style fatigues, a rifle plate carrier vest, a ballistic helmet, and a rifle was slung across his chest walking North through the museum parking lot towards the crowd. This was advised over police radio. After a period of time Detectives advised a male subject was attempting to get away from the crowd, and was spraying mace at other individuals who were chasing him. **Detectives advised a fight broke out, and then advised shots had been fired from within the crowd**. The command post was immediately advised of this information. SWAT Officers began to move in to secure the scene. **I was unable to see the incident that was taking place to the North of me**. I observed a crowd of people running in every direction, with a large number running south in my direction.

*See* **Doc. 33-6, Ex. 6** (emphasis added).

The fourth officer recounted:

I observed a total of five men that were armed with rifles and open carry handguns. Those men did not all arrive at the same time and were not always together during the progress of this event. Judging by the men's interaction they were friendly with each other and seemed to be familiar with each other. The men were dressed in camouflage clothing and one was wearing a helmet and an exterior armor plate carrier. The men did not interact with the crowd but they were confronted by protesters. I did not see any of the armed men instigating contact or antagonizing the crowd…

The activities continued and at one point a male produced a pick-ax and began striking the base of the statue. One of the men that was armed with a rifle approached the man with the pick-ax and took it away from him. I could see

several of the armed men near the top of the hill where the statue was positioned. My belief was that the armed men were protecting the statue…

I overheard on the police radio that one of the armed men was confronted by protesters and a physical fight ensued. The armed man in the fight managed to move a short distance away from the crowd…I observed a man in a blue shirt moving on foot from the area of the statue toward the sidewalk. The man was moving quickly, looking back and forth from the crowd to the street…I observed some of the people in the crowd began to move quickly toward the man in the blue shirt. As the man moved west the crowd pursued him. The crowd in pursuit was yelling loudly, and running after the man. **They moved west and out of my view. As soon as I lost view of the man and the crowd I heard several gunshots near the location where I last saw them**.

*See* **Doc. 33-3, Ex. 3** (emphasis added).

The last presentation by a detective began at 11:52 PM, and the briefing appeared to conclude sometime after. **Doc. 33-9, Ex. 9, at 2**.

### Plaintiffs are Interviewed by APD Officers

Det. Lueckenhoff was assigned as the lead detective investing the shooting. Dets. Lueckenhoff, Luna, Rogers, Guerrero, and Ana Bruciaga were tasked with interviewing Plaintiffs. Sgt. Robert Stockton oversaw and supervised the interviews, and he attended interviews conducted by Dets. Rogers, Guerrero, and Bruciaga. Before the Plaintiffs came into the custody of Dets. Lueckenhoff, Bruciaga, Guerrero, Luna, Rogers, and Sgt. Stockton, these officers knew they were interviewing "witnesses" or potential witnesses.

Plaintiff Rice was interviewed by Det. Rogers and an FBI Agent from approximately 11:30 PM to 11:46 PM. *See* **Doc. 27-7, Ex. G**; **Doc. 33-7, Ex. 7**. At the start of the interview, Det. Rogers informed Rice that he was not under arrest and he was "just detained." Plaintiff Rice was also informed that he was not going to be charged with a crime. At the conclusion of the interview, Plaintiff Rice asked Det. Rogers if Rogers could remove his handcuffs, and Det. Rogers told him he would get someone to do so. *See* **Doc. 34, Ex. 24, at 0:30**.

Plaintiff Bay was interviewed by Det. Bruciaga from 11:30 to 11:45 PM. *See* **Doc. 27-2, Ex. B**; **Doc. 23, at 9 ¶ 38**. At the start of the interview, Det. Bruciaga told Bay that he was "not under arrest," and that he was there "as a witness." Plaintiff Bay remained in handcuffs, and at the end of the interview, Det. Bruciaga removed Bay's handcuffs. *See* **Doc. 34, Ex. 23**.

Plaintiff Fitzgerald was interviewed by Det. Guerrero and an FBI agent from approximately 11:30 PM to 12:02 AM. *See* **Doc. 27-4, Ex. D**. At the start of the interview, Det. Guerrero asked "[i]t's my understanding you're a witness, right"? *See* **Doc. 34, Ex. 22**. Fitzgerald responded in the affirmative. Plaintiff Fitzgerald remained in handcuffs for approximately 18 minutes of the interview until Det. Guerrero asked another officer to remove the handcuffs. **Doc. 34, Ex. 22, at 18: 30**.

Plaintiff Burks was interviewed by Det. Rogers and an FBI agent from approximately 11:47 PM to 12:04 AM. *See* **Doc. 27-3, Ex. C**; **Doc. 33-7, Ex. 7, at 6**. Burks' handcuffs were removed before the interview. **Doc. 34, Ex. 28, at 0:45**. At the start of the interview, Det. Rogers told Burks that he was a witness and was not under arrest.

Plaintiff Espinosa was interviewed by Det. Hector Guerrero and an FBI agent from approximately 11:53 PM to 12:07 AM. *See* **Doc. 27-5, Ex. E**. Espinosa's handcuffs were removed prior to his interview, at 11:45 PM. **Doc. 34, Ex. 27, at 0:33**. At the start of the interview, Det. Guerrero told Plaintiff Espinosa that he was not in any trouble.

Plaintiff Mason was interviewed by Dets. Lueckenhoff and Luna from approximately 12:56 AM to 1:23 AM. *See* **Doc. 27-6, Ex. F**; **Doc. 33-9, Ex. 9, at 2**. Mason was not in handcuffs during his interview. **Doc. 34, Ex. 32**. At the start of the interview, Det. Lueckenhoff informed Mason that he was detained and that he was not in any trouble, and apologized that Plaintiff Mason had been there for so long.

After their interviews, Plaintiffs Fitzgerald, Burks, and Rice did not have a way to get home from the police station because their vehicles were inaccessible and they lived too far away to walk home. Plaintiffs Fitzgerald, Burks, and Rice then remained outside the station until after 1 AM, waiting for the police officers who would then drive them home. Officer Roth also drove Plaintiff Bay home.

## DISCUSSION

Defendants have asserted the defense of qualified immunity, which shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears a heavy two-fold burden. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001); *Romero v. Story*, 672 F.3d 880, 884 (10th Cir. 2012). The plaintiff must put forward evidence showing that (1) "the defendant's actions violated a constitutional or statutory right," and (2) "the right at issue was clearly established at the time of the defendant's unlawful conduct." *See Medina*, 252 F.3d at 1128 (internal quotations omitted); *Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Medina*, 252 F.3d at 1128. In determining whether the plaintiff meets this burden, the Court ordinarily accepts the plaintiff's version of the facts—"that is, the facts alleged." *See Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (internal quotations omitted). However, at the summary judgment phase of the

litigation, "the plaintiff's version of the facts must find support in the record." *Id.* (internal quotations omitted).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (internal quotations omitted). Finally, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Shero*, 510 F.3d at 1200.

## I.   <u>Whether Plaintiffs are Entitled to Additional Discovery.</u>

Concurrent with Plaintiffs' response to the merits of Defendants' motion for summary judgment, Plaintiffs' counsel submitted a Rule 56(d) affidavit requesting that the Court deny the motion to permit Plaintiffs to obtain additional discovery. *See* **Doc. 33, at 17**. Plaintiffs' requested discovery falls into two categories: (1) information about the alleged involvement and decision-making processes of Defendants Keller, Nair, and Medina prior to, during, and after the demonstration, *see* **Doc. 33-15, Ex. 15, at 2–6**, and (2) additional information known to Defendants at the time of Plaintiffs' alleged arrests bearing on Defendants' probable cause determination, ***id.* at 6–7**. The bulk of Plaintiffs' sought evidence pertains to the first category. Plaintiffs argue that the sought discovery is in Defendants' "exclusive possession," and Defendants have "refused to produce records bearing on those matters in response to Plaintiffs' multiple requests for public records pursuant to the New Mexico Inspection of Public Records Act." ***Id.* at 2–3, 7**.

Defendants argue that "Plaintiffs have waived their right to seek the relief…since they responded to the Motion for Summary Judgment; included additional evidence; and 'additional

material facts.'" *See* **Doc. 46, at 14**. Defendants also argue that "Plaintiffs cannot legitimately request to conduct discovery when they filed their own summary judgment motion without conducting any discovery" and that the discovery Plaintiffs seek is "very broad; general; and is only sought to harass, annoy, embarrass, and/or intimidate." *Id.* **at 15**.

Rule 56(d) provides that if a nonmovant shows that it cannot present facts essential to justify its opposition, the Court may: "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Normally, a Rule 56(d) request is treated liberally. *See Lewis v. City of Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990). However, where a summary judgment motion is grounded in the defense of qualified immunity, the Court's otherwise broad discretion under Rule 56(d) is circumscribed. *Id.* "Because the driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved *prior to discovery*, there is a strong policy justification for staying discovery and for refusing requests for additional discovery once a defendant invokes qualified immunity as a defense." *Martin v. Cnty. of Santa Fe*, 626 F. App'x 736, 740 (10th Cir. 2015) (internal quotations and citations omitted).

A party requesting additional discovery under Rule 56(d) "must specify (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015) (internal quotations and alteration omitted). In the qualified immunity context, the plaintiff is required to demonstrate through a Rule 56(d) affidavit "how discovery will raise a genuine fact issue as to [the defendant's] qualified immunity claim." *Lewis*, 903 F.2d at 758.

Here, first, by filing a responsive brief to Defendants' motion for summary judgment, Plaintiffs waived their right to seek additional discovery. *See, e.g.*, *Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 833 (10th Cir. 1986) ("The protection afforded by Rule 56([d] is an *alternative* to a response in opposition to summary judgment under 56[c]."); *Villa v. Bd. of Cnty. Comm'rs of Cnty. of Arapahoe*, 931 F.2d 900 (10th Cir. 1991) ("Rule 56[d] may be used only as an alternative to the filing of a brief and answer under Rule 56[c]. And when, as here, a party has responded to a summary judgment motion under Rule 56[c], that party waives any option it may have had to proceed under Rule 56[d].").

Nonetheless, first, the Court shall deny Plaintiffs' request with respect to additional information known to Defendants regarding any probable cause determination. Plaintiffs seek this information to rebut Defendants' Fourth Amendment arguments in Counts II and III. The Court notes that in the response to Defendants' motion for summary judgment as well as in their own cross motion for summary judgment, Plaintiffs stated that all the material facts necessary to render a substantive determination on the Fourth Amendment claims in Counts II and III were available in the developed evidence, which includes hours of video footage, written statements from officers, and transcripts of interviews from Plaintiffs. Therefore, the Court denies Plaintiffs' 56(d) request on this issue.

Second, the Court also denies Plaintiffs' request with respect to information sought into the involvement of Defendants Keller, Nair, and Medina, which directly bears on Count I. Plaintiffs filed a responsive brief to Defendants' Motion of Summary judgment, and therefore, Plaintiffs have waived their right to seek additional discovery. Nevertheless, Plaintiffs have also failed to meet the substantive requirements of Rule 56. Notably, Plaintiffs' requests for discovery are not grounded upon the existence of any *specific* evidence which discovery would document

and confirm, but instead, arise from Plaintiffs' beliefs that discovery of these matters may yield the evidence that they seek. Plaintiffs' vague, unspecific identification of what they hope to uncover through discovery fails to provide the requisite connection between the discovery sought and the validity of the Defendants' qualified immunity assertion. Rule 56 "is not a license for a fishing expedition, especially when summary judgment is urged based on a claim of qualified immunity." *Lewis*, 903 F.2d at 759.

To permit Plaintiffs' requested discovery would render the Defendants' qualified immunity defense a nullity. Thus, the Court finds the extent of the proposed discovery is neither warranted, reasonable, nor within the boundaries allowed once a qualified immunity defense has been raised, and accordingly, Plaintiffs' requests are **DENIED**.

## II.   Whether Plaintiffs' Fifth and Fourteenth Amendment Excessive Force Claims in Counts I, II, and III Fail as a Matter of Law.

Defendants argue that Plaintiffs have not pled plausible claims for excessive force under the Fifth and Fourteenth Amendment, thus, these claims fail as a matter of law. The Court agrees.

In evaluating a claim for excessive force, the Court "must first isolate the precise constitutional violation with which the defendant is charged because the choice of amendment matters." *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (internal quotations and alterations omitted). "Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment—all depending on where the defendant finds himself in the criminal justice system—and each carries with it a very different legal test." *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010).

The Fourth Amendment applies to claims of force used "leading up to and including an arrest of a citizen previously at liberty." *Id.*; *see also Booker*, 745 F.3d at 419. In contrast, the Eighth Amendment applies to "prisoners already convicted of a crime who claim that their punishments involve excessive force." *See Porro*, 624 F.3d at 1325–26 (emphasis omitted). And, where neither the Fourth nor Eighth Amendment applies, courts "turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities." *Booker*, 745 F.3d at 419. Thus, the Fifth or Fourteenth Amendments apply to the period between initial seizure and post-conviction punishment. *See Porro*, 624 F.3d at 1326.

Relevant here, the Fourteenth Amendment standard "governs excessive force claims arising from post-arrest and pre-conviction treatment *if the arrestee has been taken into custody pursuant to a warrant supported by probable cause*." *Booker*, 745 F.3d at 421 (emphasis added). Thus, it is well-established that the Fourteenth Amendment governs any claim of excessive force brought by a "pretrial detainee"—one "who has had a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest." *Id.* at 419 (internal quotations and alterations omitted). On the other hand, the "Fourth Amendment, not the Fourteenth, governs excessive force claims arising from treatment of an arrestee detained *without a warrant* and *prior to* any probable cause hearing." *Id.* (emphasis in original) (internal quotations and alterations omitted).

Defendants argue that Plaintiffs cannot plausibly assert claims under the Fifth and Fourteenth Amendment because "Plaintiffs were never charged with a crime…no judicial determination of probable cause occurred before, during, or after they were seized," and therefore, only the Fourth Amendment applies to their claims. *See* **Doc. 46, at 19–20**. Plaintiffs

28

argue that they assert excessive force claims under the Fifth and Fourteenth Amendment "in addition or in the alternative to" their Fourth Amendment claims, "in the event that the Court determines that they were pretrial detainees at any point during the four to five hours they were detained…rather than subjected to a continuing seizure without probable cause." *See* **Doc. 33, at 23**.

In this case, the purported excessive force occurred during Plaintiffs' alleged detention and confinement by the police. *See, e.g.*, **Doc. 22, at 22 ¶ 121** ("The Detaining Defendants kept Plaintiffs in handcuffs for several hours even though they were cooperative, not suspected of a crime, posted no threat to the officers' safety, and made no attempt to resist or evade arrest."). As Defendants note, there was no judicial determination of probable cause as Plaintiffs were not charged, arraigned, or convicted. Therefore, the appropriate excessive force analysis is pursuant to the Fourth Amendment. *See Frohmader v. Wayne*, 958 F.2d 1024, 1026 (10th Cir. 1992) (noting that claims of post-arrest excessive force by arrestees like the defendant, who was detained without a warrant, are governed by the Fourth Amendment "until they are brought before a judicial officer for a determination of probable cause to arrest"). Accordingly, the Court shall dismiss the Fifth and Fourteenth Amendment excessive force claims in Counts I, II, and III with prejudice.

### III.    Whether Plaintiffs' Fourth Amendment Claims Fail as a Matter of Law

Defendants argue that the Fourth Amendment claim fails as a matter of law because the Defendants had probable cause or arguable probable cause to arrest the Plaintiffs. **Doc. 27 at 17**. Defendants further argue that they did not use excessive force because handcuffing the Plaintiffs, placing them in the back of patrol cars, and transporting them to the Main police station was reasonable. **Doc. 27 at 22**. Defendants lastly argue that none of the Defendants violated clearly

established law. **Doc. 27 at 22-23**. Plaintiffs argue that the Plaintiffs' detention amounted to an arrest and that the Defendants did not have probable cause to arrest the Plaintiffs. **Doc. 33 at 25; Doc. 42 at 13**. Plaintiffs further argue that Defendants knew that Plaintiffs did not commit the crime, and thus, handcuffing them was an excessive use of force. **Doc. 33 at 34.**

The Court finds that the Defendants had reasonable suspicion to detain the Plaintiffs in an investigatory detention. The Court finds that the investigatory detention converted into an arrest, and that the Defendants also had probable cause and arguable probable cause to arrest the Plaintiffs. Defendants did not use excessive force against the Plaintiffs because handcuffing the Plaintiffs was reasonable in both this investigatory detention and an arrest. The Court also finds that the Plaintiffs have not met their burden that the law on June 15, 2020 was clearly established. Therefore, the Plaintiffs have not established either prong, and the Defendants are entitled to qualified immunity.

1.  **Whether Defendants actions violated Plaintiffs' constitutional rights.**

    a.  **Whether Defendants Keller, Nair, and Medina Lacked Personal Involvement in the Alleged Fourth Amendment Violation.**

Defendants argues that Keller, Nair, and Medina were not personally involved in a constitutional violation because Defendant Sanchez issued the order for the Plaintiffs to be taken into custody. **Doc. 27 at 14**. Plaintiffs argue that Keller, Nair, and Medina's personal participation and exercise of control resulted in violating the Plaintiffs' constitutional rights. **Doc. 33 at 33**. The Court finds that Keller, Nair, and Medina did not violate the Plaintiffs Fourth Amendment rights because they were not involved with the seizure of the Plaintiffs.

"A plaintiff may succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility

for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)

Plaintiffs allege numerous facts about Keller, Nair, and Medina involvement in the protest. However, these alleged facts are not supported in the record. *See Halley*, 902 F.3d at 1144 (holding that "the plaintiff's version of the facts must find support in the record"). Plaintiffs have not established that Keller, Nair, and Medina promulgated, created, implemented, or possessed responsibility for a continued operation of a policy that caused constitutional harm. The Court is aware that Medina texted, "We are planning it [sic] stay neutral. The moment the[y] commit a crime[,] cat team will move in and 16 them." **Doc. 33-1, Ex. 1**. The Court does not find this to be the creation of a policy that would cause constitutional harm. If any individuals committed a crime in view of an officer, the officer would have probable cause to arrest the individuals. More importantly, the Plaintiffs were seized based on Defendant Sanchez's commands, not Keller's, Nair's, or Medina's policies. At approximate 8:04PM, reports of shots fired occurred on APD radio. **Doc. 27-14, Ex. N, at 2**; **Doc. 47, Ex. AA, at 2:54**. Within a minute, Sanchez directed "anybody with a rifle" to be taken into custody. **Doc. 47, Ex. AA. at 3:32.** Sanchez made this decision because Det. Porter stated, "It's going to be coming from one of the rifles." *Id.* **at 3:23**. Keller, Nair, and Medina were not involved in this decision, nor did they promulgate, create, or implement policies that resulted in this decision. Plaintiffs have not met their burden in establishing that these Defendants promulgated, created, or implemented policies that caused the Plaintiffs' alleged constitutional harm. Therefore, Keller, Nair, and Medina did not violate the Plaintiffs' Fourth Amendment Rights and are, thus, entitled to qualified immunity.

### b.  Whether Plaintiffs were seized in an investigative detention or an arrest.

Plaintiffs argue that their detention was an arrest. **Doc**. **33 at 25-26**. The Court finds that the Plaintiffs' initial detainment was an investigative detention. However, the investigative detention involved into an arrest.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has identified three types of police encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions," otherwise known as *Terry* stops, "which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. White*, 584 F.3d 935, 944–45 (10th Cir. 2009) (citation omitted).

An investigative detention stop occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). In deciding whether a police encounter rises to the level of an investigatory stop, the Court must determine "whether a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." *United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir. 2021) (brackets, internal quotation marks, and citations omitted).

"Investigative detentions are Fourth Amendment seizures of limited scope and duration requiring reasonable suspicion of criminal activity." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012). Reasonable suspicion requires "considerably less" than preponderance of the evidence and "obviously less" than probable cause. *United States v.*

*Gurule*, 935 F.3d 878, 885 (10th Cir. 2019); *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.") (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion may exist even if it is more likely than not the individual is not involved in criminal activity. *See Gurule*, 935 F.3d at 885. It is not meant to be an onerous standard. *See United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). It merely requires that "officers develop a particularized and objective basis for suspecting an individual may be involved in criminal activity." *Id.* at 1379–80. When the officer has stopped a person based on reasonable suspicion of criminal activity, the officer may briefly detain the individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." *Olive*r, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).

An arrest must be based on "probable cause to believe that a person committed a crime," and "is distinguished" from an investigative detention "by the involuntary, highly intrusive nature of the encounter." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (internal quotation marks omitted). An investigative detention, on the other hand, permits an officer to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Id.* at 1115 (internal quotation marks omitted). Investigative detentions are "limited intrusion on the personal security of the suspect." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). "There is no bright line or litmus test distinguishing these two types of seizures." *Maresca v. Bernalillo Cnty.,* 804 F.3d 1301, 1308–09 (10th Cir.

2015); *see also United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

"[T]he use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." *Cortez*, 478 F.3d at 1116-17 (quotation and alterations omitted); *see also Morris v. Noe,* 672 F.3d 1185, 1192 (10th Cir.2012). Nevertheless, such techniques "do[ ] not necessarily transform [an investigative] detention into a full custodial arrest," particularly "when the circumstances reasonably warrant such measures in order for the officers to conduct an investigative detention safely." *Maresca*, 804 F.3d at 1309 (quotation omitted).

The Court finds that the initial detainment of the Plaintiffs was an investigative detention that than escalated into a custodial arrest. At approximately 8:00PM, Mr. Baca fired multiple shots. By 8:20PM, the Plaintiffs were restrained. While officers used zip ties or handcuffs on the Plaintiffs during the detainment, forceful methods may be used during an investigative detention short of arrest when such methods are necessary for officer protection. *United States v. Neff,* 300 F.3d 1217, 1220 (10th Cir. 2002). Mr. Baca had fired multiple shots, creating an unsafe situation for both officers and bystanders. Because the Plaintiffs were armed, the circumstances warranted officers to zip tie or handcuff the Plaintiffs and secure their weapons. *see, e.g. United States v. Shareef,* 100 F.3d 1491, 1495–99, 1506 (10th Cir.1996) (holding display of firearms, removing occupants from three stopped vehicles and frisking and handcuffing them did not transform *Terry* stop occurring late at night into an arrest because officers "reasonably suspected [one of the motorists] of being armed and dangerous"); *United States v. Perdue,* 8 F.3d 1455, 1458–59, 1462–63 (10th Cir.1993) (holding fact that two officers removed two occupants from vehicle at

gunpoint and made them lie on the ground did not transform *Terry* stop occurring in remote area into an arrest where officers reasonably believed occupants were "armed and dangerous")

Defendants had reasonable suspicion to detain the Plaintiffs in an investigative detention. Plaintiffs were armed. It is not unreasonable for officers to have suspicion of an armed individual immediately after a shooting, particularly when the scene is not secured. The confusion is apparent in moments after shots were fired. Plaintiff Espinosa stated he did not know who fired the shots because of conflicting stories. **Doc. 34, Ex. 19 at 10:19**. Det. Porter stated on the radio that he was "unsure exactly which one shot. It's going to be coming from one of the rifles." **Doc. 27-14, Ex. N at 5:21-22**. Demonstrators told officers that "they. . . shot at us." **Doc. 43, Ex. 11, at 1:48**. Plaintiff Bay admitted that he at first "thought [the shooting] was one of ours." **Doc. 27-2, Exh. B at 10:18-20.**

The investigative detention evolved into a custodial arrest. Although there is no rigid time limit on an investigative detention, "it is clear that the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *Sharpe,* 470 U.S. at 685, (quotation omitted). Plaintiffs' detainment was not brief. Plaintiffs were detained at approximately 8:20PM, and Plaintiffs were released from custody between 11:45PM to 1:23AM. As such, Plaintiffs experienced a detainment ranging between 3 to 5 hours. The Tenth Circuit is clear that long durations of detainment provide strong evidence of arrest. *See, e.g., Manzanares v. Higdon*, 575 F.3d 1135, 1148 (10th Cir. 2009) (3 hour detention constituted an arrest); *Walker,* 451 F.3d at 1150 (90 minute detention constituted an arrest); *United States v. Edwards,* 103 F.3d 90, 93 (10th Cir.1996) (45 minute detention constituted an arrest); *Shareef,* 100 F.3d at 1501–02 (30 and 45 minute detentions did not constitute arrests). Officers did not conduct a diligent

investigation. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. The Court finds it reasonable that the Plaintiffs were moved into police vehicles and transferred to the police station. A hostile crowd began to form around the Plaintiffs to the point that the Tactical Team had to deploy smoke. **Doc. 28, Ex. S at 21:20.** In addition, the scene was still not secured, and the crowd had not fully dispersed, creating a difficult and unsafe place for officers to conduct interviews that would dispel suspicion. However, once at the police station, the investigative detention became an arrest because officer did not diligently conduct the Plaintiffs' interviews. Plaintiffs started to arrive at the police station around 9:15PM and were not interviewed until 11:30PM. **Doc. 34, Ex. 20; Doc. 27-2, Ex. B; Doc. 23, at 9 ¶ 38.**

<blockquote>

c.   **Whether Defendants Sanchez, Sandoval, Golson, Grube, Kimminau, Roth, Sampang, and Urioste had probable cause to arrest the Plaintiffs.**

</blockquote>

Defendants argue that Defendant Sanchez had reasonable suspicion and probable cause to arrest the Plaintiffs. **Doc. 27 at 20**. Plaintiffs argue that the Defendants did not have probable cause because an investigation would have revealed that the Plaintiffs were witnesses. **Doc. 33 at 26; Doc. 42 at 22-23**. The Court finds Defendant Sanchez had probable cause and Defendants Sandoval, Golson, Grube, Kimminau, Roth, Sampang, and Urioste reasonably relied on Defendant Sanchez's probable cause determination.

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *Donahue v. Wihongi*, 948 F.3d 1177, 1189 (10th Cir. 2020). "Police officers have probable cause to arrest if 'the facts and circumstances within the arresting officers' knowledge and of which they had

reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *Id.* (quoting *Adams*, 407 U.S. at 148). "[C]ourts assess probable cause 'from the standpoint of an objectively reasonable police officer' under the totality of the circumstances." *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "[T]he probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." *Romero v. Fay*, 45 F.3d 1472, 1476–77 (10th Cir. 1995). Probable cause therefore "may arise from information provided by individuals." *Donahue*, 948 F.3d at 1189.

As discussed, Sanchez had reasonable suspicion to detain the Plaintiffs because multiple shots were fired, Plaintiffs were armed, and Det. Porter stated that it was coming from one of the rifles. Additionally, shortly after the shooting, officers did not know who exactly fired their weapon. Det. Porter stated, "Unsure exactly which one shot. . . It's going to be coming from one of the rifles . . ." **Doc. 47 Ex. AA at 3:23.** An officer described that it was "unknown as to who fired the shots . . ." **Doc. 33-5, Exh 5 at 2.** Finally, the chaotic scene made it difficult to determine who was involved in the shooting. An officer described that a portion of the crowd "was now running back to the east, away from the gunfire." **Doc. 33-3, Exh. 3 at 2.** Another officer described how he "heard screams as [he] viewed several people running back eastbound." **Doc. 33-5, Exh 5 at 2.** It is clear that an officer would have to make a split-second decision, and therefore, the Court finds it reasonable that Defendant Sanchez concluded probable cause existed to arrest the Plaintiffs. *Lundstrom v. Romero*, 616 F.3d 1108, 1119-20 (10th Cir. 2010) (holding that courts should consider whether an "officer may have been forced to make split-second

decisions in a stressful, dynamic, and dangerous environment" when determining the reasonableness of an officer's actions).

Defendants further argue that Defendants Sandoval, Luekenhoff, Luna, Stockton, Rogers, Bruciaga, Guerrero, Golson, Kimminau, Roth, Sampang, Grube, and Urioste are entitled to qualified immunity under the vertical collective knowledge doctrine. **Doc. 27 at 20.** Plaintiffs argue that vertical collective doctrine does not apply to the Defendants because each Defendant knew Plaintiffs were witnesses, not suspects. **Doc. 33 at 29.** The Court finds that it was reasonable for Defendants Sandoval, Golson, Grube, Kimminau, Roth, Sampang, and Urioste to act in reliance of Defendant Sanchez's reasonable suspicion and probable cause determination.

"Under the collective knowledge doctrine, the officer who makes the stop need not have reasonable suspicion that criminal activity is afoot." *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012). "Instead, the knowledge and reasonable suspicions of one officer can be imputed to another." *Id.* (citing *United States v. Chavez*, 534 F.3d 1338, 1345-1346 (10th Cir. 2008) ). "The collective knowledge doctrine has two categories—horizontal and vertical." *Id.* (citation omitted). "Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action." *Id.* "Thus, an officer with reasonable suspicion may instruct another officer to make a *Terry* stop without communicating the basis for the stop, so long as the communicating officer has reasonable suspicion to make the stop himself." *Id.*

It was reasonable for detaining officers to rely on Defendant Sanchez's conclusion of probable cause. *See Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 882 (10th Cir. 2014) ("A police officer who acts 'in reliance on what proves to be the flawed conclusions of a fellow

police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable.'" (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1286 (10th Cir.2010))). First, as discussed, Defendant Sanchez did in fact have reasonable suspicion and probable cause to detain the Plaintiffs when he ordered officers to detain the Plaintiffs. Additionally, as officers went to detain the Plaintiffs, members of the crowd informed officers that "*they* . . . shot at us." **Doc. 43, Ex. 11 at 1:48** (emphasis added). Therefore, it was reasonable for Defendants Sandoval, Golson, Grube, Kimminau, Roth, Sampang, and Urioste to act in reliance of Defendant Sanchez's determination of reasonable suspicion and probable cause. Therefore, Defendants Sanchez, Sandoval, Golson, Grube, Kimminau, Roth, Sampang, and Urioste did not falsely arrest the Plaintiffs.

> ### d.   Whether Defendants Lueckenhoff, Bruciaga, Guerrero, Luna, Rogers, and Stockton had probable cause to arrest the Plaintiffs.

Plaintiffs argue that Defendants Lueckenhoff, Bruciaga, Guerrero, Luna, Rogers, and Stockton did not have probable cause to arrest the Plaintiffs because they had knowledge that Baca was the shooter, not Plaintiffs. **Doc. 42 at 23-24**. Defendant argues that probable cause still existed because the Defendants did not know if Plaintiffs aided or abetted Baca in the shooting and Defendants had probable cause to arrest the Plaintiffs for violating New Mexico statutes. **Doc. 50 at 23-24**. Plaintiffs argue that probable cause to arrest the Plaintiffs for violating the New Mexico statutes came during the interviews after the Plaintiffs were arrested, and therefore, the information cannot retroactively be used to form probable cause.[14] **Doc. 54 at 20**. The Court finds that Defendants Lueckenhoff, Bruciaga, Guerrero, Luna, Rogers, and Stockton had probable cause to arrest the Plaintiffs.

---

[14] The Court agrees that probable cause must be established before the arrest, and therefore, the Court will not use the information obtained from the interviews to determine if Defendants had probable cause.

Defendants Lueckenhoff, Guerrero, Luna, and Rogers attended a briefing discussing the events of the shooting, and as such, these Defendants had the most knowledge about what had occurred. The Court finds it was not reasonable for Defendants Lueckenhoff, Bruciaga, Guerrero, Luna, and Rogers to have reliance on Defendant Sanchez probable cause determination because they could form their own probable cause determination based on the available facts. However, even if the Defendants knew Baca was the shooter, the Court still finds that these Defendants had probable cause to arrest the Plaintiffs.

Even after receiving the briefing or learning that Baca was the shooter, the Court still finds that probable cause existed because officers could conclude that the Plaintiffs and Baca were affiliated, and such affiliation meant that Plaintiffs aided and abetted in the shooting. Prior to the shooting, officers observed Baca, similar to the Plaintiffs, protecting the statute. Baca "prevent[ed] [people] from pushing the statue over." **Doc. 33-2.** Plaintiffs and Baca both got into disagreements and scuffles with protestors. **Doc. 50-1, Ex. C, at 1**; **Doc. 50-7, Ex. II, at 2–3**; **Doc. 27-5, Ex. E, at 2–3; Doc. 34, Ex. 19, at 0:03**. After the shooting, Plaintiffs made a perimeter around Baca and protected him from the crowd. An undercover officer stated that the Plaintiffs kept "the crowd from attacking [Baca]." **Doc. 33-2, Exh. 2 at 2.** While the majority of the Plaintiffs were dressed in military style uniform, Plaintiff Fitzgerald, like Baca, was in casual attire. Furthermore, as discussed, the crowd associated Plaintiffs and Baca together, accusing the Plaintiffs of being involved with the shooting. **Doc. 43, Ex. 11 at 1:48**. The Court finds that probable cause existed to arrest the Plaintiffs because an officer could conclude that Baca and Plaintiffs were working together in the criminal activity.

Additionally, the Court finds that Defendants would have probable cause to arrest Plaintiffs for violating NMSA 1978 § 30-27-2.1. NMSA 1978, § 30-27-2.1 states that it is

unlawful to "impersonat[e] a peace officer", including "attempting to exercise the functions of a peace officer or pretending to be a peace officer with the intent to deceive another person." NMSA 1978, § 30-27-2.1. Peace officer is defined as "any public official or public officer vested by law with a duty to maintain public order or to make arrests for crime, whether that duty extends to all crimes or is a limited to specific crimes." *Id*.

The Court finds that Plaintiffs exercised the functions of a peace officer. Plaintiffs attended the protest wearing body armor and military style uniform, except for Plaintiff Fitzgerald. Plaintiffs were armed. **Doc. 27-5, Ex. E, at 2**; **Doc. 27-4, Ex. D, at 2**; **Doc. 34, Ex. 22, at 3:13**; **Doc. 27-6, Ex. F, at 2**; **Doc. 43, Ex. 10, at 10:15**; **Doc. 43, Ex. 25, at 2:08**. An officer described how Plaintiffs protected the statute from protesters and prevented someone from using a pickaxe. **Doc. 33-3, Ex. 3.** An officer also recounted how after the shots were fired, Plaintiffs moved towards Baca, stepped on the gun, and protected Baca from the crowd. **Doc. 33-2, Ex. 2.** These actions were sought to maintain public order, a specific function for peace officers. NMSA 1978, § 30-27-2.1. Therefore, even if Defendants Lueckenhoff, Bruciaga, Guerrero, Luna, Rogers, and Stockton lacked probable cause to arrest Plaintiffs based on the shooting, they did have probable cause to arrest the Plaintiffs for violating NMSA 1978, § 30-27-2.1.

### e.   Whether Defendants used excessive force against the Plaintiffs.

Plaintiffs argue that the Defendants used excessive force because the Plaintiffs did not pose an immediate threat during their detention and did not resist or flee. **Doc. 33 at 33.** Plaintiffs further argue that the prolonged handcuffing constitutes excessive force under the Fourth Amendment. **Doc. 42 at 26**. Defendants argue that appropriate use of force was used because the situation was volatile, the Plaintiffs were armed, and members of the crowd were

accusing the Plaintiffs of being involved with the shooting. **Doc. 27 at 21-22.** The Court finds that the Defendants did not use excessive force when detaining Plaintiffs.

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Claims that state actors used excessive force in the course of a seizure are analyzed under the Fourth Amendment's reasonableness standard. *Id.* A court must judge the reasonableness of a particular use of force from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight ... includ[ing] an examination of the information possessed by the [officers]." *Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008) (citations and internal quotation marks omitted). The United States Supreme Court maintains that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. When evaluating a claim of excessive force, courts must keep in mind that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment." *Id.* at 396; *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (noting "even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back ... officer would be justified in using more force than in fact was needed").

Courts consider excessive force claims under the balancing test from *Graham v. Connor*, 490 U.S. 386 (1989), which delineates "three, non-exclusive factors": "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or

others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Fisher v. Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).

Here, Espinosa and Fitzgerald hands were secured by zip ties and the remainder of Plaintiffs were handcuffed. Officers eventually removed Plaintiff Espinosa zip-ties and placed him in handcuffs. Plaintiff Fitzgerald zip ties were removed when he was taken to the bathroom and then replaced with handcuffs. The Court finds that Defendants did not use excessive force. Plaintiffs argue that there is no crime at issue because the Plaintiffs were witnesses. The Court disagrees. As the Court discussed, officers had reasonable suspicion to detain the Plaintiffs as it related to the shooting. *Supra* III.1.b. Because Plaintiffs were armed, they also posed an immediate threat to the safety of the officers and others. The Court finds it reasonable that Plaintiffs were handcuffed or zipped tied to address the safety concerns. *Id.* The Court also finds it reasonable that Plaintiffs were transferred to avoid confrontations with the crowd. *Id.*

Additionally, officers had probable cause to arrest Plaintiffs. *Supra* III.1.c, d. "[I]n nearly every situation where an arrest is authorized ... handcuffing is appropriate." *Mglej v. Gardner*, 974 F.3d 1151, 1166 (10th Cir. 2020) (quoting *Fisher*, 584 F.3d at 896). "The right to make an arrest ... necessarily carries with it the right to use *some* degree of physical coercion or threat thereof to effect it." *Id.* (emphasis added) (quoting *Graham*, 490 U.S. at 396). "[T]he Fourth Amendment 'does not require [police] to use the least intrusive means in the course of a detention, only reasonable ones.'" *Fisher*, 584 F.3d at 894 (quoting *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005)); *see also id.* (observing that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment" (quoting *Graham*, 490 U.S. at 396)). Consequently, "[a]n excessive force claim that includes a challenge to the '[m]anner or course of handcuffing' requires the

plaintiff to show both that 'the force used was more than reasonably necessary' and 'some non-de minimis actual injury.'" *Mglej*, 974 F.3d at 1167 (quoting *Donahue*, 948 F.3d 1177 at 1196).

The Court does not find that the force used in the handcuffs was more than reasonably necessary. When Plaintiffs complained about the handcuffs, officers took reasonable steps to adjust them. For example, Officer Reese adjusted Plaintiff Rice's handcuffs. **Doc. 28, Ex. T at 40:30.** Officer Williams adjusted Plaintiff Mason's handcuffs. **Doc. 28, Ex. Y, at 1:24**. After Plaintiff Espinosa complained that the zip-ties were unbearable and he would rather be handcuffed, Officer Golson removed the zip-ties and handcuffed him. **Doc. 43, Ex. 26, at 1:48**. Officer Urioste adjusted Plaintiff Burks handcuffs and removed some gear for Plaintiff Burk to sit comfortably. **Doc. 43, Ex. 25, at 0:41**. When Plaintiff Burk mentioned his shoulder, Officer Urioste used two sets of handcuffs to give Plaintiff Burk more room. **Doc. 43, Ex. 27, at 0:32.**

The Court is sympathetic of Plaintiff Fitzgerald situation, but Officers reasonably tried to accommodate Plaintiff Fitzgerald's medical condition. Officer Sampang took Plaintiff Fitzgerald to the restroom. **Doc. 51, Ex. U3, at 1:00**. Officer Urioste checked on Plaintiff Fitzgerald 30 minutes later, at which time, Plaintiff Fitzgerald indicated he was okay. **Doc. 34, Ex. 22, at 18:00; Doc. 43, Ex. 21, at 1:01**. It is reasonable for officers to take Plaintiff Fitzgerald at his word, and thus, reach the conclusion that Plaintiff Fitzgerald did not need to use the restroom. Unfortunately, five minutes later and unbeknownst to the officers, Plaintiff Fitzgerald needed to use the restroom again. **Doc. 34, Ex. 22, at 18:00**. Officers continued to check on Plaintiff Fitzgerald, and Officer Sampang escorted Plaintiff Fitzgerald to the restroom again. **Doc. 43, Ex. 21, at 0:45, 4:00**. The Court finds that officers took reasonable steps to accommodate Plaintiff Fitzgerald condition when he was detained. For the prior reasons, the Court finds that Defendants did not use excessive force. Because Defendants did not violate Plaintiffs' Fourth Amendment

rights, Plaintiffs have failed to establish the Defendants' actions violated a constitutional right. Therefore, Defendants are entitled to qualified immunity.

2. **Whether the right at issue was clearly established at the time of the Defendant's unlawful conduct.**

Defendants argue that even if the Defendants did not have probable cause, the Defendants had arguable probable cause. **Doc. 27 at 17.** Defendants further argue that based on the law that existed on June 15, 2020, none of the Defendants would have been on notice that they had violated clearly established law. **Doc. 27 at 22**. Plaintiffs argue that Defendants did not have arguable probable cause to arrest the Plaintiffs because Defendants had knowledge that Baca was the shooter, and the Plaintiffs were witnesses. **Doc. 54 at 21.** The Court finds Plaintiffs have not met their burden that the rights at issue were clearly established.

a. **Defendants had arguable probable cause to arrest the Plaintiffs.**

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)). As a practical matter, "[i]n the context of a qualified immunity defense on an unlawful arrest claim, we ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)).

"When a warrantless arrest is the subject of a § 1983 action, the arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to make the arrest." *Robertson v. Las Animas Cnty. Sheriff's Dep't,* 500 F.3d 1185, 1191

(10th Cir.2007). Under this framework, sometimes referred to as "arguable probable cause," "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Cortez,* 478 F.3d at 1120 & n. 15. In evaluating arguable probable cause, we apply an objective standard, so any subjective intentions are irrelevant. *See Mocek v. City of Albuquerque*, 813 F.3d 912, 925 (10th Cir. 2015) (explaining that an "officer's subjective intent" is not part of an arguable probable cause inquiry).

The Court finds that Defendants could have reasonably but mistakenly concluded that probable cause existed to arrest the Plaintiffs because of the shooting. An officer could reasonably believe that they had probable cause to arrest the Plaintiffs based on the information available and the need to make a split-second decision. s*ee, e.g., Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011) (qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments."); *Koch v. City of Del City*, 660 F.3d 1228, 1241 (10th Cir. 2011) ("[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.") (citation omitted), *cert. denied,* 133 S.Ct. 211 (2012). As discussed, the situation was volatile, Plaintiffs were armed, Det. Porter stated it came from a rifle, the crowd was accusing Plaintiffs of firing at them, and it appeared that Plaintiffs were affiliated with Baca. *Supra* III.1.c., d. The Court finds that the Defendants could have reasonably but mistakenly concluded that probable cause existed.

The Court also finds that the Defendants could have reasonably but mistakenly concluded that probable cause existed to arrest Plaintiffs for violating NMSA 1978 § 30-27-2.1. Plaintiffs participated in functions of a peace officer because they wore military attire, protected the statue from protestors, secured Baca's gun, and protected Baca. *Supra* III.1.d. Therefore, the Court

finds it reasonable for Defendants to mistakenly conclude probable cause existed to arrest

Plaintiffs for violating NMSA 1978 § 30-27-2.1.

The Court also finds it reasonable for Defendants to mistakenly conclude probable cause

existed to arrest Plaintiffs for violating NMSA 1978, § 30-13-1, NMSA 1978, 30-20-3 and

NMSA 1978, § 30-20-13. Under NMSA 1978, § 30-13-1, it is unlawful to "disturb[] any meeting

of the people assembled for any legal object." NMSA 1978, § 30-13-1. NMSA 1978, § 30-30-3

states that it is unlawful to assemble together "with intent to do any unlawful act with force or

violence against the person or property of another. . ." *Id.* § 30-30-3 Finally, under NMSA 1978

§ 30-20-13, no person is allowed to "willfully deny to staff, public officials or the general public:

(1) lawful freedom of movement within the building or facility or land on which it is situated; (2)

lawful use of the building or facility or the land on which it is situated." *Id.* § 30-20-13.

Defendants received numerous 911 calls to report the Plaintiffs' presence at the protest. Plaintiffs

got into verbal altercations and a "little scuffle" with individuals, and they prevented protestors

from accessing the statue. *See* **Doc. 50-1, Ex. C, at 1**; **Doc. 50-7, Ex. II, at 2–3**; **Doc. 27-5, Ex.**

**E, at 2–3**. Defendants could reasonably but mistakenly conclude that the Plaintiffs were

disturbing a lawful assembling because of the 911 calls, the Plaintiffs were preventing lawful

freedom of movement because the Plaintiffs denied access to the statute, and the Plaintiffs were

planning to use force to stop the protestors because they were armed and having altercations with

protestors. Therefore, the Court finds Defendants could have reasonably but mistakenly

concluded probable cause existed to arrest Plaintiffs for violating NMSA 1978, § 30-13-1,

NMSA 1978, 30-20-3 and NMSA 1978, § 30-20-13.

       **b.  Plaintiffs have not met their burden that the rights at issue were clearly established.**

"The law is clearly established if there is a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, that has found the law to be as the plaintiff maintains." *Gadd v. Campbell*, 2017 WL 4857429, at *4 (10th Cir. 2017). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 136 S.Ct. 305 at 308 (internal quotation marks omitted). "Clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (internal quotation marks omitted). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* "Nonetheless ... there need not be a prior 'case directly on point,' so long as there is existing precedent that places the unconstitutionality of the alleged conduct 'beyond debate.'" *McCowan v. Morales*, 945 F.3d 1276, 1285 (10th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)); *A.N. ex rel. Ponder v. Syling*, 928 F.3d 1191, 1197-98 (10th Cir. 2019) (same); *see, e.g., McCowan*, 945 F.3d at 1287 (explaining that Tenth Circuit case law provides "notice that the gratuitous use of force against a fully compliant, restrained, and non-threatening misdemeanant arrestee [is] unconstitutional" (emphasis added)).

Plaintiffs bear the burden of citing to case law and articulating the clearly established right theyclaim had been violated. *See Thomas v. Durastanti,* 607 F.3d 655, 669 (10th Cir. 2010); *Martinez v. Carr*, 479 F.3d 1292, 1295 (10th Cir. 2007) ("[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." (internal quotation marks omitted)).

Plaintiffs have failed to satisfy their burden that the law on June 15, 2020 was clearly established so that Defendants would have known that their conduct violated the Plaintiffs' Fourth Amendment Rights. Instead of offering cases that include facts that are sufficiently

analogues and specific so that a reasonable official would know "that his conduct was unlawful in the situation he confronted", the Plaintiffs engages in more general statements of the law, which is not enough to satisfy their burden. *Saucier v. Katz*, 533 U. S. 194, 202 (2001); *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) ("We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced"). For the law to be clearly established, it "requires a high degree of specificity." *Wesby*, 138 S. Ct. at 590 (emphasis added) (citing *Saucier,* 533 U.S. at 202).

Plaintiffs cited to numerous cases to reference general legal principles; however, the facts of said cases drastically differ from the facts in this present case. See *Baptiste v. J.C. Penney Co*., 147 F.3d 1252, 1254 (10th Cir. 1998) (describing an individual alleged of shoplifting when a videotaped revealed she owned the ring); *United States v. Valenzuela*, 365 F.3d 892, 894-5 (10th Cir. 2004) (holding that two cars driving near one another with Arizona plates is not enough to establish probable cause); *Harte v. Bd. of Comm'rs of Cty. of Johnson*, 864 F.3d 1154, 1159-60 (10th Cir. 2017) (holding that a surveillance of the house would have revealed that the Hartes were not growing marijuana); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 663 (10th Cir. 2010) (describing how the officer tased Cavanaugh even though she was not holding a knife); *Sandberg v. Englewood, Colo.*, 727 F. App'x 950, 953-54 (10th Cir. 2018) (describing how individual was detained for open carrying a gun into an auto shop); *United States v. King*, 990 F.2d 1552, 1563 (10th Cir. 1993) (describing how individual was detained after officer saw him with a gun in his car); *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 747 (10th Cir. 2021) (describing how officer fired two shots at individual after individual refused to raise his hands was dug into his waistband); *Martinez v. Mares*, 613 F. App'x 731, 733-734 (10th Cir. 2015)

(describing how after the mistaken identity was corrected, officer still frisked the individual); *United States v. Lopez,* 443 F.3d 1280, 1284-86 (10th Cir. 2006) (describing how officer kept the individuals license even after confirming the individual owned the car); *Manzanares*, 575 F.3d at 1139 (describing how officer handcuffed the individual because he did not want him to inform the suspect); *Lundstro v. Romerom*, 616 F.3d 1108, 1117-18 (10th Cir. 2010) (describing how officers handcuffed the individual even though she was not resisting and their was no evidence of a child in the residence); *Storey v. Taylor*, 696 F.3d 987, 995 (10th Cir. 2012) (describing how an officer handcuffed an individual for refusing to talk about a domestic argument). None of the cases cited involve an active shooter in a crowded area, and thus, the Plaintiffs have failed to meet their burden.

Plaintiffs' failure to carry their burden of showing the law was clearly established entitles the Defendants to qualified immunity. *See Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (plaintiff failed burden under qualified immunity by failing to cite to any Supreme Court or Tenth Circuit opinion that would indicate right was clearly established); *Thomas*, 607 F.3d at 669 ("The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law."); *Hedger v. Kramer*, 2018 WL 1082983, at *5 (10th Cir. 2018) ("The failure to identify [] a case is fatal to the claim."). Accordingly, Defendants are entitled to qualified immunity on Count I, II, and III, under both prong of the qualified immunity inquiry.

Accordingly, the Court shall dismiss the Fourth Amendment claims in Counts I, II, and III with prejudice.

**IV.   <u>Whether Plaintiff's New Mexico Torts Claim Fails as a Matter of Law</u>**

The Court will reserve judgment on Count V, which the Court has supplemental jurisdiction. The doctrine of supplemental jurisdiction is "a doctrine of discretion, not of

plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (**Doc. 27**) is **PARTIALLY GRANTED** with respect to constitutional claims raised in Count I, II, and III, and these claims are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (**Doc. 42**) is **DENIED.**

IT IS SO ORDERED.

**KEA W. RIGGS**
**UNITED STATES DISTRICT JUDGE**